273 P.3d 1196

**STATE of Hawai'i, Respondent/Plaintiff–Appellee,**

v.

**Pulumata'ala ELI, Petitioner/Defendant–Appellant.**

**No. SCAP–30420.**

Supreme Court of Hawai'i.

April 13, 2012.

512

David Glenn Bettencourt, for petitioner/defendant-appellant.

Donn Fudo, Deputy Prosecuting Attorney, for respondent/plaintiff-appellee.

ACOBA, DUFFY, and McKENNA, JJ.; with RECKTENWALD, C.J. concurring and dissenting, with whom NAKAYAMA, J., joins; and with NAKAYAMA, J., dissenting, with whom RECKTENWALD, C.J., joins.

Opinion of the Court by ACOBA, J.

We hold in this case that after arrest the police practice of inviting an arrestee to make a statement and to give his or her "side of the story" or similar entreaties in a "pre-interview" before Miranda warnings are given, violates the defendant's right against self-incrimination, article I, section 10,[1] and right to due process, article I, section 5[2] of the Hawai'i Constitution. Further, we hold that under the circumstances of this case the *Mirandized* statement offered into evidence at trial resulted from the exploitation of the said pre-interview practice. The *Miranda* warnings subsequently given did not remove the "taint" of such practice. Accordingly, on the grounds set forth herein, we vacate the March 4, 2010 judgment of conviction and sentence filed by the circuit court of the first circuit (the court)[3] adjudging Petitioner/Defendant–Appellant Pulumata'ala Eli (Defendant) guilty of attempted manslaughter, and remand for a new trial.

I.

The following essential matters, some verbatim, are from the record and the submissions of the parties.

Defendant was arrested on October 27, 2007, for assaulting and seriously injuring his seven-month-old daughter on October 24, 2007, while inside a minivan at Ala Moana Beach Park. He was transported to the police station, where he gave a statement about the incident. He was indicted on October 31, 2007, by Respondent/Plaintiff–Appellee State of Hawai'i (the prosecution or the State) for attempted murder in the second degree, with the special circumstance that his daughter was eight years of age or younger, Hawai'i Revised Statutes (HRS) §§ 705–500 (1993),[4]

1. Haw. Const. art. I, § 10 provides:
   No person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury or upon a finding of probable cause after a preliminary hearing held as provided by law or upon information in writing signed by a legal prosecuting officer under conditions and in accordance with procedures that the legislature may provide, except in cases arising in the armed forces when in actual service in time of war or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy; nor shall any person be compelled in any criminal case to be a witness against oneself.

2. Haw. Const. art. I, § 5 provides:
   No person shall be deprived of life, liberty or property without due process of law, nor be denied the equal protection of the laws, nor be denied the enjoyment of the person's civil rights or be discriminated against in the exercise thereof because of race, religion, sex or ancestry.

3. The Honorable Randal K.O. Lee presided.

4. HRS § 705–500 provides in its entirety as follows.

707–701.5 (1993),[5] and 706–656 (Supp.2007).[6]

On June 9, 2009, the prosecution filed a "Motion to Determine Voluntariness of Defendant's Statement," so that Defendant's statement could be used at trial. The prosecution's motion stated, *inter alia*, that "[a] defendant's statement may not be received into evidence until the prosecution shows that the defendant was warned of his *Miranda* rights, that the defendant waived these rights, and that the statement was voluntarily made." (Citing *State v. Kreps*, 4 Haw.App. 72, 76–77, 661 P.2d 711, 714–15 (1983).)[7] A hearing was held on June 12, 2009, in which the interviewing Detective (Detective) of the Honolulu Police Department (HPD) testified, as follows, about the circumstances in which Defendant gave his statement.

Defendant had agreed to turn himself in on October 26, 2007, but, instead of doing so, left a message with Detective, stating that he would turn himself in the next afternoon at Kapiolani Hospital.[8] Defendant was met at the hospital the next day by the police, arrested, and brought to the main police station.

At the station, Detective met Defendant in an interview room at the central receiving desk and explained to him that he was under arrest for assaulting his daughter. Detective testified that during this encounter he asked Defendant if he wanted to give a statement and "may have mentioned to him that, you know, it's a chance to give me his side of the story." Detective stated that he did not imply to Defendant that by hearing his side of the story things might change. Apparently, Defendant agreed to make a statement at this point.

Detective then activated his tape recorder and used an HPD–81 form to advise Defendant of his constitutional rights. Defendant had a copy of the form in front of him as Detective read it out loud. Detective testified that he informed Defendant of his right to remain silent, his right to terminate the interview at any time, his right to stop answering questions, his right to an attorney, his right to have an attorney appointed by the court if he could not afford one, his right to consult with an attorney and have an attorney present during the questioning, and that anything he said could be used against him at

---

**§ 705–500. Criminal attempt.** (1) A person is guilty of an attempt to commit a crime if the person:

(a) Intentionally engages in conduct which would constitute the crime if the attendant circumstances were as the person believes them to be; or

(b) Intentionally engages in conduct which, under the circumstances as the person believes them to be, constitutes a substantial step in a course of conduct intended to culminate in the person's commission of the crime.

(2) When causing a particular result is an element of the crime, a person is guilty of an attempt to commit the crime if, acting with the state of mind required to establish liability with respect to the attendant circumstances specified in the definition of the crime, the person intentionally engages in conduct which is a substantial step in a course of conduct intended or known to cause such a result.

(3) Conduct shall not be considered a substantial step under this section unless it is strongly corroborative of the defendant's criminal intent.

5. HRS § 707–701.5 provides in its entirety as follows.

**§ 707–701.5. Murder in the second degree.** (1) Except as provided in section 707–701, a person commits the offense of murder in the

second degree if the person intentionally or knowingly causes the death of another person.

(2) Murder in the second degree is a felony for which the defendant shall be sentenced to imprisonment as provided in section 706–656.

6. HRS § 706–656 provides in relevant part as follows.

**§ 706–656. Terms of imprisonment for first and second degree murder and attempted first and second degree murder.**
. . . .

(2) Except as provided in section 706–657, pertaining to enhanced sentence for second degree murder, persons convicted of second degree murder and attempted second degree murder shall be sentenced to life imprisonment with possibility of parole. The minimum length of imprisonment shall be determined by the Hawaii paroling authority; provided that persons who are repeat offenders under section 706–606.5 shall serve at least the applicable mandatory minimum term of imprisonment.

7. Defendant did not file a motion to suppress the statement.

8. Defendant's daughter was apparently hospitalized at Kapiolani Hospital.

trial. According to Detective's testimony, Defendant responded to the questions asked and did not seem to have any problem understanding what was occurring. Detective stated that he asked Defendant if he wanted an attorney, to which Defendant responded, "No, not now[.]" Defendant filled out the HPD–81 form and waived his *Miranda* rights.

Detective then began questioning Defendant, and obtained a taped statement from Defendant. In the taped statement, Defendant told Detective that on the day of the incident, he had been "trying to work things out" with his girlfriend in their minivan at Ala Moana Beach Park. Defendant said he was frustrated at the time, and that his daughter, who was sitting in the back seat, would not stop crying. He stated that he hit his daughter on the feet and slapped her on the head four times. Defendant then told Detective that he took his daughter out of her car seat and dropped her by accident. He subsequently admitted to throwing his daughter on the car seat "[f]ace first" two times.

After hearing Detective's testimony, the court determined Defendant's statement was "voluntarily, intelligently, and knowingly made," rendering Defendant's statement admissible at trial. Following the voluntariness hearing, Defendant's jury trial began.

On June 19, 2009, during the proceedings, defense counsel notified the court that there was a second HPD–81 form completed on October 28, 2007, the day after Detective first interviewed Defendant, in which Defendant refused to waive his *Miranda* rights.[9] Defense counsel asked the deputy prosecuting attorney (DPA) for a recording of the event on October 28, 2007, but the DPA informed defense counsel that no recording existed. The court excused the jury and held a hearing to allow defense counsel to question Detective, in court, about the second HPD–81 form.

Detective again testified that, on October 27, 2007, prior to obtaining the taped statement referred to *supra*, he had a conversa-

tion with Defendant before giving Defendant his *Miranda* warnings. During that conversation, "[Detective] asked [Defendant] if he wanted to give [Detective] a statement[,]" and Defendant "agreed to give [Detective] a statement[.]" When asked by Defendant's counsel, "But the whole purpose of giving the Miranda warning is so that he can decide whether he wants to give you a statement or not[,]" Detective replied that he "didn't ask [Defendant] any questions about the case." Detective acknowledged that on October 27 he had explained to Defendant that it was "[Defendant's] chance to give his side of the story."

Also, Detective agreed he had obtained "a waiver" before administering the *Miranda* warnings. The relevant testimony is as follows:

[DEFENSE COUNSEL:] Did you have any conversation with

[Defendant] prior to turning on the tape recorder on the statement that you took between 1825 hours to 1900 hours on the 27th or *did you ask him whether he was willing to give a statement before you turned on the tape recorder*?

[DETECTIVE:] *Yes.* Yes.

[DEFENSE COUNSEL:] And he said yes?

[DETECTIVE:] Yes, he was willing to give a statement.

[DEFENSE COUNSEL:] Why do you not tape that part of this? *So he agreed basically prior to the time you ever warned him of his right to remain silent.*

[DETECTIVE:] *He agreed to give me a statement when I asked him if he wanted to give me a statement after* I informed him why he was here, why he was under arrest.

[DEFENSE COUNSEL:] But the whole purpose of giving the Miranda warning is so that he can decide whether he wants to give you a statement or not.

[DETECTIVE:] I didn't ask him any questions about the case.

---

9. Defense counsel appears to have had received the HPD–81 form in discovery, but "didn't pick up on the fact" that it was a different one from

that which Defendant had filled out on October 27, 2007.

[DEFENSE COUNSEL:] Now, let's go back to the night before. You got him to agree to give you a statement before you ever gave him the warnings of his right to remain silent?

[DETECTIVE:] *I asked him if he wanted to give a statement—It's his chance to give his side of the story.*

[DEFENSE COUNSEL:] *Is that what you told him?*

[DETECTIVE:] *Yes, I think—I believe so.*

[DEFENSE COUNSEL:] And so at that time you gave him the Miranda warnings, *you had already got an answer out of him, a waiver that he was going to give a statement?*

[DETECTIVE:] *Yes.*

(Emphases added.)

Detective stated that subsequently, on October 28, 2007, he saw Defendant about injuries discovered on his daughter. "Prior to any questioning" and without activating his tape recorder, Detective advised Defendant of his *Miranda* rights. At that point, Defendant "elected not to give a statement." Defendant then executed an HPD–81 form reflecting his refusal to answer any questions. Although Detective also testified that it is HPD standard procedure to tape record the *Miranda* warnings given to suspects in a felony investigation, he did not tape record the October 28 "follow-up interview" because he had "asked [Defendant] if he was willing to give . . . a statement[,]" and "[Defendant] elected not to give a statement."

After Detective testified, Defendant moved to exclude the October 27 *Miranda* statement on the ground that Detective "obtained the waiver of his right to remain silent prior to giving the Miranda warning[,]" and moved for a mistrial, arguing that this evidence had not been disclosed. According to Defendant, Detective "obtained [Defendant's] waiver of [his] right to remain silent without ever providing Miranda warnings[,]" and that mandated that the October 27 statements be suppressed.

In Defendant's view, "the whole purpose of giving the *Miranda* warning[s is] so that [the defendant] can decide whether he wants to give . . . a statement[.]" Thus, according to Defendant, a waiver of silence before being apprised of the *Miranda* rights cannot be a knowing and voluntary waiver of the right to remain silent. The court denied Defendant's motion for exclusion of the evidence and for a mistrial, determining that "[D]efendant knew he could make a statement or not make a statement[,]" and the court had "already determined that the statement was made voluntarily."

On June 22, 2009, before Defendant's taped statement was played to the jury, Defendant again moved to suppress the October 27 statement and moved for a mistrial. According to defense counsel, the *Miranda* warning could not "undo the taint" of the pre-*Miranda* waiver because Detective "got the mind set of [D]efendant . . . to talk rather than not to talk." These motions were denied in the following ruling by the court:

> [Defendant] clearly understood he was arrested for a crime. The detective identified himself, indicated why he was talking to the defendant, namely, he was arrested, and merely asked, *would you like to tell me your side of the story? . . . [T]his was not securing a waiver of . . . his Miranda [rights],* but merely asking the defendant whether or not he wanted to make a statement or not.

(Emphasis added). The taped recording of Defendant's statement was then played to the jury.

On June 30, 2009, the court issued its "Findings of Fact, Conclusions of Law, and Order Finding Voluntariness of Defendant's Statement." The court made the following relevant findings:

> 3. Based on the police investigation, Detective arranged to have [Defendant] surrender himself to [HPD] on October 26, 2007.

> 4. On October 26, 2007, [Defendant] failed to appear as scheduled and instead, left a phone message to the detective indicating that he would turn himself in on October 27, 2007.

> 5. On October 27, 2007, [Defendant] was arrested by [HPD] . . . and transported to the main police station.

6. [Defendant] was met by [Detective] who identified himself, informed [Defendant] that he was arrested for the assault on his seven-month-old daughter, ... and may have asked [Defendant] whether he would like to speak to him and tell his side of the story.

7. [Detective] testified that [Defendant] stated that he wanted to speak to him and that he brought [Defendant] to an interview room[.]

. . . .

11. [Detective] proceeded to warn [Defendant] of his *Miranda* rights using HPD 81 form.

The court made the following relevant conclusions:

2. *[Defendant] claims that the statement was not voluntarily, intelligently or knowingly made since [Detective] failed to read [Defendant] his constitutional rights under Miranda prior to asking [Defendant] whether he would like to speak to him and tell him his side of the story.*

. . . .

5. ... [A]n individual being subjected to custodial interrogation must not be asked any questions without being given *Miranda* warnings....

. . . .

8. The test to determine if a custodial interrogation has taken place, for purposes of determining whether *Miranda* warnings are required, is *whether the investigating officer should have known that his or her words or conduct were reasonably likely to evoke an incriminating response.*

. . . .

11. Here, [Defendant] contends that his statement to [Detective] was involuntarily made and should not be allowed into evidence. Specifically, [Defendant] claims that, [Detective]'s failure to advise [Defendant] of his constitutional rights under *Miranda* prior to asking [Defendant] if he wanted to speak to him and tell his side of the story, rendered the recorded statement inadmissible.

12. In *State v. Luton*, 83 [Hawai'i] 443, 927 P.2d 844 (1996), the Hawai'i Supreme Court addressed a similar type of issue presented in this case.

13. In *Luton*, [ ], *the defendant waived his constitutional rights under* Miranda, *and made a statement to the police after the detective advised the defendant that it would be in his best interest to give a statement.*

14. Following the reasoning in *State v. Kelekolio*, 74 Haw. 479, 849 P.2d 58 (1993), and *Commonwealth v. Meehan* [377 Mass. 552], 387 N.E.2d 527 (Mass.1979), the Hawaii Supreme Court in *Kelekolio*, [74 Haw. at 505, 849 P.2d at 70,] found that the "'*[m]ere advice from the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary.*'" [ (quoting *State v. Amaya–Ruiz*, 166 Ariz. 152, 800 P.2d 1260, 1273 (1990)) ].

15. Finding that there were no coercive threats, promises used to extract a confession from the defendant, the Hawaii Supreme Court held that the statements made by the defendant were not obtained in violation of the defendant's constitutional rights.

16. Applying the reasoning expressed in *Luton*, [ ] to the evidence in this case, the [c]ourt finds and concludes that *[Detective]'s statement where he asked [Defendant] if he wanted to speak to him and tell his side of the story did not rise to the level of advising, threatening and/or promising the Defendant anything in order to obtain his statement.*

. . . .

18. The [c]ourt finds and concludes that [Detective] never asked [Defendant] anything about the alleged offense and *his conduct was not designed to elicit a spontaneous incriminating statement from [Defendant].*

19. The [c]ourt finds that *[Detective]'s conduct was preliminary in nature* and was made merely to inform [Defendant] why he was arrested, identify himself and explain why he was meeting with [Defendant]. *Obviously, since [Defendant] and his girlfriend ... were the only two people in the van that could possibly have in-*

jured the infant, [Detective] merely asked [Defendant] if he wanted to speak to him about the events surrounding the alleged crime. [Detective] never advised [Defendant] that he should make a statement, never coerced, threatened or promised [Defendant] anything for his statement and [Defendant] could have chosen not to make a statement.

. . . .

23. [Defendant] was read his *Miranda* rights through the use of a HPD 81 form, he initial [sic] each statement on the HPD 81 form indicating that his rights were explained to him, he understood his rights, and that *he elected to waive his rights and make a statement. [Defendant] indicated he understood his rights, did not want an attorney, and wanted to tell [Detective] what happened.*

24. The [c]ourt further finds and concludes that since [Defendant] had effectively waived his constitutional rights, *his statements were made voluntarily, intelligently, and knowingly.*

(Some emphasis in original and some emphasis added.)

The jury found Defendant guilty of attempted manslaughter. The jury also answered affirmatively two special interrogatories inquiring whether it found Defendant inflicted serious bodily injury on a person eight years or younger, and whether Defendant knew or should have known that the

person was eight years or younger. An amended judgment of conviction and sentence was entered on March 4, 2010.

## II.

Notice of appeal to the ICA was filed by Defendant on April 5, 2010. Defendant filed his opening brief on November 30, 2010. In connection with Defendant's statement to Detective, the following point of error was raised:

> A. The . . . court committed prejudicial error by ignoring the suppression of the *Miranda* violation, by refusing to allow further proceedings on voluntariness,[10] and by denying a mistrial.[11]

(Capitalizations omitted.)

On March 14, 2011, Defendant applied for mandatory and discretionary transfer of his appeal from the ICA to this court. Transfer was accepted on April 15, 2011.

## III.

In connection with the first point of error,[12] Defendant contends that his statement to Detective must be excluded because (1) it was obtained after an unrecorded waiver when recording was feasible, and (2) he was subjected to interrogation during a "pre-interview" without being advised of his *Miranda* rights.[13] The prosecution answers

10. Defendant maintains that the court "refus[ed]" to allow further proceedings on voluntariness. However, neither Defendant nor the prosecution point to where in the record Defendant asked for further proceedings on voluntariness, or argued that the court should conduct additional proceedings. A review of the record indicates that Defendant did not seek further proceedings, but argued that the October 27 statement should have been suppressed due to a *Miranda* violation, and moved for a mistrial. Additionally, the opening brief focuses on the court's error as denying suppression, and, other than the question, does not address any refusal by the court to conduct additional proceedings. Insofar as Defendant did not object to the failure to conduct further proceedings, and Defendant does not argue in his opening brief that the court's refusal to allow further proceedings on voluntariness was error, this assertion is not addressed further.

11. Although the denial of a mistrial is one of Defendant's stated points of error, Defendant does not directly support it in his argument. Instead, Defendant makes the contentions set out in the analysis provided herein.

12. Defendant raised three other questions with respect to his extended term sentence. The disposition herein moots those questions.

13. Defendant also contends, in the argument section of the opening brief, that Defendant was denied a full and fair hearing due to "prosecutorial misconduct[.]" He appears to refer to the prosecution's purportedly "questionable compliance" with Hawai'i Rules of Penal Procedure (HRPP) Rule 16 (2007), and Detective's purported "evasive" answers to Defendant's questions during the June 12 hearing. To the extent that Defendant refers to the October 28 HPD form in connection with any HRPP Rule 16 violation, Defendant's counsel stated that he had received

that Defendant's statement is admissible because it was knowingly, intelligently, and voluntarily made, as concluded by the court.

■ In relation to his first contention, Defendant argues (1) that Detective was required by (a) *State v. Kekona*, 77 Hawai'i 403, 886 P.2d 740 (1994), and (b) HPD policy, to record the encounter with Defendant on October 27, 2007 through which he allegedly obtained an unrecorded waiver of Defendant's constitutional rights, and (2) that as a matter of public policy, any statements obtained after an unrecorded waiver should be per se inadmissible where recording was feasible.

Defendant relies on *Kekona* to argue that recording of custodial interrogations is required by due process. *Kekona* held that the due process clause of the Hawai'i Constitution does not require the recording of custodial interrogations. *Id.* at 408–09, 886 P.2d at 745–46. This court stated that "whether the failure of the police to create a record of the defendant's confession undermines its accuracy and detracts from the credibility of later testimony is an issue uniquely left to the sound discretion of the trier of fact." *Id.* at 409, 886 P.2d at 746. In the present case, the court did not find that Detective's failure to record his pre-*Miranda* conversation with Defendant undermined the accuracy of Defendant's statement or detracted from the credibility of later testimony.

■ In light of *Kekona*, we must reject Defendant's assertion that a violation of the HPD policy on recording renders a statement inadmissible[14] and that this court should, as a matter of public policy, exclude statements obtained after an unrecorded waiver. As noted in *Kekona*, defendants

have the opportunity to cross-examine the police officers who conducted their interrogations, and to set forth their own account of events through testimony. *Id.* After utilizing these tools, "[i]t is for the trial judge as factfinder to assess the credibility of witnesses and to resolve all questions of fact." *State v. Eastman*, 81 Hawai'i 131, 139, 913 P.2d 57, 65 (1996) (citing *Lono v. State*, 63 Haw. 470, 473, 629 P.2d 630, 633 (1981)). *Kekona* also concluded that even if this court were to adopt an exclusionary rule for statements obtained after an unrecorded waiver, the problems with reliability and deception asserted by Defendant would not be resolved.[15]

### IV.

In connection with his second contention, Defendant argues that his statement must be excluded because he was questioned prior to being advised of his *Miranda* rights. Defendant maintains that without being so advised, it cannot be determined whether Defendant's initial agreement to make a statement was knowing, therefore tainting his subsequent *Mirandized* statement. According to Defendant, Detective bifurcated his interrogations, "effecting a pre-Miranda and then a post-Miranda process of interrogation[,]" which constitutes "evasive pre-interviews recently condemned in *State v. Joseph*, 109 Hawai'i 482, 128 P.3d 795 (2006)."

### A.

■ Article I, section 10 of the Hawai'i Constitution provides that "[n]o person shall ... be compelled in any criminal case to be a witness against himself." *State v. Pau'u*, 72 Haw. 505, 509, 824 P.2d 833, 835 (1992) (quoting article 1, section 10). It is established

the HPD form in discovery, but did not recognize that it was different from the one Defendant filled out on October 27. Thus, it is unclear how the prosecution "questionabl[y] compli[ed]" with HRPP Rule 16. As to Detective's purported "evasive" answers, inasmuch as a finding of "evasiveness" or credibility is not for this court to make, this argument is not addressed further.

14. The specific HPD policy on recording is not reproduced by the parties or reflected in the record.

15. This court stated in *Kekona:*

[E]ven if we were to hold that the due process clause mandates the recording of *station house* interrogations, there would still be a "hush all over the [state] tonight." This time, however, the silence in the station houses would come from the new police policy of conducting all interrogations out in the field where, the minority apparently concedes, the due process clause does not require that interrogations be recorded.

77 Hawai'i at 409, 886 P.2d at 746 (emphasis in original).

that "[w]hen a confession or other evidence is obtained in violation of [this right], the prosecution will not be permitted to use it to secure a defendant's criminal conviction." *Id.* (citing *State v. Russo,* 67 Haw. 126, 681 P.2d 553 (1984)).

In *State v. Santiago,* 53 Haw. 254, 266, 492 P.2d 657, 664 (1971), this court held that "the protections which the United States Supreme Court enumerated in *Miranda* have an independent source in the Hawai'i Constitution's privilege against self incrimination." [16] Article I, section 10 of the Hawai'i Constitution requires that,

> before reference is made at trial to statements made by the accused during custodial interrogation, the prosecutor must first demonstrate *that certain safeguards were taken before the accused was questioned.* ... [T]he prosecutor must show that each accused was warned that he had a right to remain silent, that anything said could be used against him, that he had a right to the presence of an attorney, and that if he could no[t] afford an attorney one would be appointed for him.

*Id.* (emphasis added). Thus, under article I, section 10, the *Miranda* rule, "a constitutionally prescribed rule of evidence[,]" "requires the prosecution to lay a sufficient foundation" being "that the requisite warnings were ad-ministered and validly waived" "before it may adduce evidence of a defendant's custodial statements that stem from interrogation during his or her criminal trial." *State v. Ketchum,* 97 Hawai'i 107, 117, 34 P.3d 1006, 1016 (2001).[17] If there has been a *Miranda* violation, "statements made by the accused may not be used either as direct evidence ... or to impeach the defendant's credibility during rebuttal or cross-examination." *Id.* at 116, 34 P.3d at 1015. Indeed, "[i]t is a fundamental tenet of criminal law that 'the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.'" *State v. Wallace,* 105 Hawai'i 131, 137, 94 P.3d 1275, 1281 (2004) (quoting *Naititi,* 104 Hawai'i at 235, 87 P.3d at 904). Therefore, absent *Miranda* warnings, any statements made in the course of custodial interrogation without a valid waiver are inadmissible at trial. *Id.*

To reiterate, Defendant argued before the court that Defendant's October 27 *Mirandized* statement must be suppressed because Defendant's agreement to make that statement was obtained after Detective's inquiry but before any *Miranda* warnings were given. In evaluating Defendant's *Miranda* claim, however, the court determined that

---

**16.** As the United States Supreme Court has said, "[u]nder [*Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983)], state courts are absolutely free to interpret state constitutional provisions to accord greater protection to individual rights than do similar provisions of the United States Constitution." *Arizona v. Evans,* 514 U.S. 1, 8, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995). "If a state court chooses merely to rely on federal precedents as it would on the precedents of all other jurisdictions, then it need only make clear by a plain statement in its judgment or opinion that the federal cases are being used only for the purpose of guidance, and do not themselves compel the result that the court has reached." *Long,* 463 U.S. at 1041, 103 S.Ct. 3469. Thus, "[i]f the state court decision indicates clearly and expressly that it is alternatively based on bona fide separate, adequate, and independent grounds, [the decision will not be reviewed by the Court.]" *Id.* The decision in this case rests on "bona fide separate, adequate, and independent state [constitutional] grounds." *See id.* Federal law is being used only for the purpose of guidance, and does not compel the result that this court has reached. See *id.* Rather, the Hawai'i Constitution and the case law thereunder are the bases for this decision.

**17.** It must be emphasized that the *Miranda* requirement, based on article 1, section 10 of the Hawai'i Constitution, requires warnings to be given prior to questioning in a custodial setting, while constitutional due process, based on article 1, section 5 of the Hawai'i Constitution, requires a statement to be "voluntary" in order to be admissible. *See Ketchum,* 97 Hawai'i at 117 n. 18, 34 P.3d at 1016 n. 18. "Put differently, if a defendant's *Miranda* rights against self-incrimination have been violated, then any resulting statement will be inadmissible at trial as a *per se* matter, obviating the need for any [voluntary] due process inquiry into whether the defendant's confession has been coerced[.]" *State v. Naititi,* 104 Hawai'i 224, 237, 87 P.3d 893, 906 (2004). "Correlatively, having been properly *Mirandized,* if a defendant who is subjected to custodial interrogation makes a statement, then, depending on the circumstances, an inquiry into whether the defendant's right to due process of law has been violated via coercion, may be warranted." *Id.*

Detective's pre-*Miranda* question was "preliminary" and "was not designed to elicit a spontaneous incriminating statement" from Defendant. It appears that the court was wrong, as explained *infra*, and, thus, *Miranda* warnings were required before Detective asked Defendant if he wanted to relate his side of the story.

## B.

■ Under *Miranda*, warnings must be provided when a defendant is (1) in custody, and (2) under interrogation. *State v. Ah Loo*, 94 Hawai'i 207, 210, 10 P.3d 728, 731 (2000). At the outset, it must be noted that the court erred in characterizing Detective's question and statement as "preliminary" in determining that Defendant's statement was admissible.[18] Whether a question is or is not "preliminary" is not determinative of whether *Miranda* warnings were required. *Cf. Naititi*, 104 Hawai'i at 237, 87 P.3d at 906 (noting that, "[b]y no stretch of the imagination could ... preliminary 'yes-or-no' " questions of whether the defendant wished to make a statement and be afforded the assistance of an attorney be construed as the type that were "reasonably likely to elicit an incriminating response");[19] *See Ketchum*, 97 Hawai'i at 121 n. 21, 34 P.3d at 1020 n. 21 (declining to adopt, as an exception to the

18. To reiterate, the court determined that "[Detective]'s conduct was preliminary in nature and was made merely to inform [ ] Defendant that he was arrested, identify himself and explain why he was meeting with [ ] Defendant." The court did not support its statement with any case law, and did not explain how, or why, a statement responding to a "preliminary" question, if that question constituted interrogation, is admissible in the absence of *Miranda* warnings.

19. In *Naititi*, the defendant, who was deaf and mute, was taken to an interview room and an interpreter was provided. The interpreter testified that, before the defendant was asked any questions, in sign language, the defendant stated that he was "sorry". The interpreter testified that when the detective told the defendant that he was going to ask the defendant some questions, and explained that the defendant had a right to a lawyer, the defendant *"continued to talk as if he just was not responding to what ...* the detective was saying to him." *Naititi*, 104 Hawai'i at 228, 87 P.3d at 897 (emphasis added). The interpreter explained that the defendant "did not understand [the interpreter's] gestures and signs and that [the defendant] was definitely not

required warnings, that if an officer expressly asks an arrestee for biographical data, the arrestee's response is *not* suppressable, and instead noting that the better rule is "requiring police to preface *all* interrogation of a suspect with *Miranda* warnings if they want his or her responses to be admissible at trial") (internal quotation marks and citation omitted) (emphasis added). If a defendant was in custody and subjected to interrogation without having been advised of his *Miranda* rights, statements from that person "are inadmissible in a subsequent criminal proceeding brought against that person." *Joseph*, 109 Hawai'i at 498, 128 P.3d at 811. Thus, in the instant case, the issue is whether Defendant was in custody and whether the question and statement constituted interrogation. *See State v. Amorin*, 61 Haw. 356, 362, 604 P.2d 45, 49 (1979) ("[B]efore any questions are asked of an in-custody suspect, the required warnings must be given and unless and until such warnings are proven by the prosecution, no statements obtained as a result of custodial interrogation may be used.").

## V.

## A.

■ As to custody, it has been established that this element is satisfied if the

responsive." *Id.* at 228, 87 P.3d at 897. The detective stopped the interview. This court determined that the defendant's statements were *"volunteered* [.]" *Id.* at 238, 87 P.2d at 907 (emphasis added). According to this court, if the defendant could not understand the questions posed to him, then he could not have intended his statements to be responsive to them. *Id.* at 238, 87 P.2d at 907.

In contrast to *Naititi*, in the instant case, asking Defendant if he wanted to give a statement was combined with Detective's explanation that in doing so it was Defendant's chance to give his side of the story and that in doing so the detective obtained "a waiver" for the Mirandized statement before the *Miranda* warnings were given. This could not be considered anything *but* interrogation, and objectively was designed to elicit an incriminating response from Defendant after his arrest, i.e., an explanation of his side of the story with respect to the incident. Furthermore, Defendant's statements were not unresponsive or "volunteered[,]" *id.* insofar as they were given in direct response to Detective's questions, and Defendant clearly understood the question posed by Detective. Thus, *Naititi* is inapplicable.

defendant has been "taken into custody or otherwise deprived of his freedom ... in any significant way." *State v. Hoey*, 77 Hawai'i 17, 33, 881 P.2d 504, 520 (1994) (internal quotation marks omitted). This was plainly the case here. Defendant was in custody when Detective asked whether Defendant wished to make a statement. Defendant had been placed under arrest, and therefore was deprived of his freedom in a significant way.

### B.

As to interrogation, this court has held that it "involves any practice reasonably likely to invoke an incriminating response without regard to objective evidence of the intent of the police[.]" *Joseph*, 109 Hawai'i at 495, 128 P.3d at 808. The interrogation element depends on " 'whether the police officer should have known that his or her words or actions were reasonably likely to elicit an incriminating response' from the person in custody." *Ketchum*, 97 Hawai'i at 119, 34 P.3d at 1018 (quoting *State v. Ikaika*, 67 Haw. 563, 698 P.2d 281 (1985)). As stated before, an "incriminating response" "refers to both inculpatory and exculpatory responses." *Joseph*, 109 Hawai'i at 495, 128 P.3d at 808.

In *Joseph*, a *Miranda* violation was found during a recorded pre-interview between the defendant and police where the defendant had not yet been informed of his *Miranda* rights. *Id.* at 496, 128 P.3d at 809. Due to his arrest and detainment, we concluded that the defendant was in custody at the time of the pre-interview. *Id.* It was also decided that the following pre-interview exchange included interrogation:

> MR. JOSEPH: The car was into the bluff like this, and the door was open like this.
> [DEFENSE COUNSEL]: Right, right, you shooting up the bluff or—
> MR. JOSEPH: No, I'm leaning my back into the vehicle.
> [DETECTIVE]: *So, he's leaning with his back against the bluff.*
> MR. JOSEPH: *Yeah, yeah.*

*Id.* (emphases in original). In *Joseph*, the detective's statement about the defendant leaning his back against the bluff "sought con-firmation of Joseph's previous statement and was intended to illicit [sic] a response." *Id.* As a result, it was concluded that the detective should have known that his statement was reasonably likely to elicit an incriminating response. *Id.*

*State v. Pebria*, 85 Hawai'i 171, 174, 938 P.2d 1190, 1193 (App.1997), is also instructive. There, the defendant was seated in the lobby area of Queen's Medical Center with two security guards standing by him, and a female was speaking to a police officer in the lobby area. *Id.* at 173, 938 P.2d at 1192. The officer who was speaking to the female pointed to the defendant, identified him as "the other person involved in the incident," and asked Officer Rodriguez, who had just arrived after being dispatched to investigate an initial report of assault, to obtain the defendant's information. *Id.*

Officer Rodriguez then asked the defendant, "Do you know why you're being detained?" to which the defendant responded, "I went grab the girl." *Id.* After being told that he was now a suspect in a kidnapping case, the defendant informed the officer that he "like rape" the victim. *Id.* The ICA determined that the officer's initial question to the suspect, "Do you know why you're being detained?" constituted a statement "reasonably likely to elicit an incriminating response" insofar as the question "in essence asked [the defendant], 'Do you know that you are being detained because the woman talking to [another police officer] is accusing you of assaulting her?' " *Id.* at 174, 938 P.2d at 1193. Thus, the defendant's answer was ruled inadmissible at trial.

As related, Detective explained that Defendant was under arrest for assaulting Defendant's daughter, and then "asked [Defendant] if he wanted to give a statement[,]" as it was "his chance to give his side of the story." By asking for Defendant's "side" of the story, Detective implied that the other "side" of the story supported Defendant's arrest for assault and that Defendant was invited to respond to it.

Given that Defendant was advised he was under arrest for assault, and his child was in the hospital allegedly due to his acts, Detec-

tive should have known that asking Defendant for his side of the story and indicating that it was his chance to give that story was "reasonably likely" to elicit an incriminating response; in other words, it was reasonably likely that the detective's question and statement solicited Defendant to speak about the circumstances of the case that had resulted in his arrest. Similar to *Joseph*, the detective's pre-interview invitation to Defendant to give his "side of the story" was a "practice reasonably likely to invoke an incriminating response [even] without regard to . . . the intent of the police[.]" *Joseph*, 109 Hawai'i at 495, 128 P.3d at 808. Moreover, in this case the detective concurred that by his prior questions he had already obtained an answer from Defendant—a "waiver" that he was going to "give a statement," although Defendant had yet to be informed of his *Miranda* rights. Hence, under the circumstances, "it is evident that *Miranda* warnings, as independently grounded in the Hawai'i Constitution, [were] required prior to [this] pre-interview." *Id.* at 495, 128 P.3d at 808.

### C.

The police's custodial solicitation of Defendant's side of the story without first informing Defendant that he had the right to remain silent is prohibited under *Miranda*. It must be reemphasized that "*Miranda* recognizes a waiver of rights *only if those rights are known to the defendant* [,]" and "[n]othing but mischief would flow from a rule that would permit a defendant to *waive the right to be informed* of the rights embodied in the *Miranda* warnings." *Id.* at 497, 128 P.3d at 810 (internal quotation marks and citation omitted) (emphases added).

By asking Defendant if he wanted to give his side of the story without first stating the *Miranda* warnings, Detective violated Defendant's right to be informed of his right to remain silent before making the decision and commitment to give a statement. In inviting Defendant to speak and in obtaining his commitment to do so before Miranda warnings were given, the police elicited statements without informing Defendant of the consequences of his waiving his right to remain silent and the entire panoply of rights such a

commitment involved. In effect, in getting Defendant to agree to give a statement before being informed of his rights, the police invoked a practice that would permit a defendant to waive the right to be informed of his *Miranda* rights when *Miranda* recognizes a waiver of rights only if those rights are known to the defendant. *See id.* Accordingly, in this case there could be no valid waiver of Defendant's right to remain silent.

In similar circumstances, this court has said, "[T]he due process clause [Haw. Const. Art. I, sec. 5] serves to 'protect the right of the accused in a criminal case to a fundamentally fair trial.' Implicit in a 'fundamentally fair trial' is a right to make a meaningful choice between confessing and remaining silent." *Id.* at 494, 128 P.3d at 807 (quoting *State v. Bowe*, 77 Hawai'i 51, 59, 881 P.2d 538, 546 (1994)). In the absence of the *Miranda* warnings, no meaningful choice could be made by Defendant to remain silent or to agree to make a statement. Thus, in violation of Defendant's due process right to a fair trial, the court also erred in determining that the question and statement by the detective were merely "preliminary."

### VI.

The remaining issue is whether Defendant's Mirandized statement is admissible at trial because *Miranda* warnings were given before the statement was taken. In that regard, "the fruit of the poisonous tree doctrine prohibits the use of [a statement] at trial which [has] come [ ] to light as a result of the exploitation of a previous illegal act of the police." *Joseph*, 109 Hawai'i at 498, 128 P.3d at 811 (internal quotation marks and citations omitted).

*Luton* and *Joseph* are instructive in this regard. In Luton, the defendant was arrested and thought to be involved in a stabbing. *Luton*, 83 Hawai'i at 446, 927 P.2d at 847. Shortly thereafter, before the defendant was informed of his rights, an officer heard the defendant say, "I needed the money," and that he "didn't do it, it was someone else." *Id.* The day after his arrest, two detectives advised the defendant of his constitutional rights. *Id.* The defendant "indicated that he

understood his rights, and agreed to waive them and to make a videotaped statement[,]" wherein he admitted being in the victim's hotel room at the time of the stabbing. *Id.* Following the interview, the defendant was again advised of his *Miranda* rights, and, after waiving his rights, the defendant "made several incriminating statements[.]" *Id.* at 447, 927 P.2d at 848.

After he was charged with murder in the second degree and burglary in the second degree, the defendant filed a motion to suppress the pre-*Miranda* statements to the officer that the defendant "needed the money" and that he "didn't do it," as well as the post-*Miranda* statements, arguing that they were not voluntary and were made in violation of his Fifth and Sixth Amendment rights. The circuit court suppressed the statements. *Id.* at 449, 927 P.2d at 850. Inasmuch as the State did not appeal the circuit court's determination that the pre-*Miranda* statements had to be suppressed, the issue on appeal was whether the defendant's post-*Miranda* statements were admissible.

This court rejected the defendant's argument that his waivers were "the fruit of prior police illegality" because statements elicited "from him during his arrest, but before reading him his *Miranda* rights[,]" "tainted" his subsequent confessions. *Id.* at 454–55, 927 P.2d at 855–56. According to this court, the defendant's "waiver was not predicated on the [pre-*Miranda*] statements" inasmuch as "there [wa]s no indication in the record that HPD detectives exploited [the defendant's] illegally obtained statements[,]" "[n]or [wa]s there evidence to support a claim that officers used those statements to induce [the defendant] into making a confession[,]" and the transcripts and the videotaped interview of the defendant were "devoid of any mention" of the defendant's previous admissions. *Id.* at 455, 927 P.2d at 856.

■ Contrastingly, it is apparent that Defendant's purported "waiver" of his right to remain silent, made after *Miranda* warnings, was directly "predicated" on his agreement, pre-*Miranda*, to make a statement. That commitment was preceded by the inquiry and statement from Detective before De-

fendant was informed of his right to remain silent. In light of Detective's pre-*Miranda* question and statement, the *Miranda* warnings given thereafter became merely an interlude between the un-*Mirandized* solicitation for Defendant's side of the story and the post-*Miranda* statement, that Defendant had already agreed to make. Inasmuch as Defendant had already waived his right to remain silent by agreeing to make a statement, as indicated by the circumstances in the record and the testimony of Detective, the recitation of rights that followed the pre-interview was only a formality.

Under these circumstances, the *Mirandized* statement was obtained by exploiting the illegality of the pre-interview procedure. Similarly, there were no intervening circumstances from which it can reasonably be said that the taint from the pre-interview violation had dissipated preceding the *Miranda* statement. As noted, Detective's testimony confirms this, inasmuch as he indicated that at the time he gave Defendant the *Miranda* warnings, he had already obtained an alleged waiver of Defendant's *Miranda* rights, since Defendant had agreed to make a statement.

In *Joseph*, this court concluded that the post-*Miranda* statements had to be suppressed. There, the defendant, before being given *Miranda* warnings, told police officers that he was in his vehicle shooting at the "Pali Golf Course" clubhouse. 109 Hawai'i at 485, 128 P.3d at 798. Subsequent to the pre-interview, "a formal interview was conducted, (the post-*Miranda* interview)," where, after being advised of his rights, the defendant gave a statement. *Id.* The circuit court suppressed the post-*Miranda* statement, and this court affirmed the suppression. *Id.* at 491, 128 P.3d at 804. We said, "The pre-interview statements were exploited in that [the defendant] was subsequently questioned on the same matter in order that he would repeat his earlier statement." *Id.* at 499, 128 P.3d at 812. Additionally, the defendant's post-*Miranda* statement was not sufficiently attenuated from the pre-interview *Miranda* violation because "[t]he post-interview was conducted by the same two detectives in the same interrogation room with no lapse in time between it and the pre-interview." *Id.*

Likewise, Defendant's pre-*Miranda* statement was "exploited" in that Defendant "was

subsequently questioned" on the same matter he had agreed to talk about before being informed of his *Miranda* rights. Both the pre-interview and post-*Miranda* interview were conducted by the same detective, and the statement was obtained after the pre-interview. The statement was the product of the un-*Mirandized* pre-interview inquiry and statement by the detective. The taint of the pre-interview violation, then, had not dissipated at the time of the statement.

In the instant case, the State has not demonstrated that Defendant's post-*Miranda* statement was obtained without exploiting the *Miranda* violation, and that the statement was sufficiently attenuated from the *Miranda* violation to dissipate the taint of the violation. Inasmuch as the incriminating statement given by Defendant on October 27 was obtained in violation of the *Miranda* rule, the statement should not have been admitted in evidence and must be excluded.

### VII.

For the reasons stated, we vacate the (1) June 30, 2009 Findings of Fact, Conclusions of Law, and Order Finding Voluntariness of Defendant's Statement" of the court; and (2) the March 4, 2010 judgment of conviction and sentence.[20] We instruct the court to enter an order suppressing the October 27, 2007 statement of Defendant, and remand the case to the court for a new trial.[21]

Concurring and Dissenting Opinion by RECKTENWALD, C.J., in which NAKAYAMA, J., joins.

I join in Justice Nakayama's dissent, but write separately to address the majority's holding that the post-*Miranda* confession given by petitioner/defendant-appellant Pulumata'ala Eli was the "fruit of the poisonous tree" and therefore should have been suppressed. In my view, even assuming *arguendo* that the detective should have given *Miranda* warnings to Eli before asking if he was willing to be interviewed, Eli's confession should not be suppressed. The confession was not obtained from the exploitation of Eli's response that he was willing to make a

---

**20.** It is well established that, "[w]here there exists a reasonable possibility that a constitutional error of the trial court contributed to the conviction of the defendant, the error necessitates reversal." *Amorin*, 61 Haw. at 362, 604 P.2d at 49–50. In other words, if the error "raised the reasonable possibility of having contributed to the conviction below[,]" it cannot be "harmless beyond a reasonable doubt." *Id.* Defendant was charged with attempted murder in the second degree which required proof that Defendant "intentionally engage[d] in conduct" that would constitute murder. His statement that he struck and threw the baby out of frustration and that he was angry because the baby would not stop crying is evidence of his conduct and of his state of mind.

Thus, the error in admitting the statements "raised the reasonable possibility of having contributed to the conviction[,]" *id.*, inasmuch as the statement indicated his act and intent at the relevant time. *See id.* at 358, 362, 604 P.2d at 47, 50 (determining that the circuit court's admission of the defendant's statement, in violation of *Miranda*, that he stole the car in defendant's trial for unauthorized control of a propelled vehicle "raised the reasonable possibility of having contributed to the conviction below" and this court could not "say that it was harmless beyond a reasonable doubt"). Hence, in the instant case, it cannot be said that the court's error in admitting Defendant's statement was harmless beyond a reasonable doubt.

**21.** As noted, Defendant was charged with attempted murder in the second degree, with the special circumstance that his daughter was eight years of age or younger, HRS §§ 705–500 (1993), 707–701.5 (1993), and 706–656 (Supp.2007). However, he was found guilty of attempted manslaughter under HRS §§ 705–500 and 707–702(2). HRS § 707–702(2) (1993) provides in relevant part that:

(2) In a prosecution for murder or attempted murder in the first and second degrees it is an affirmative defense, which reduces the offense to manslaughter or attempted manslaughter, that the defendant was, at the time the defendant caused the death of the other person, under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation. . . . .

Because Defendant was found guilty of attempted manslaughter, he was impliedly acquitted of attempted murder in the second degree, and double jeopardy bars retrial for that offense. *See State v. Kalaola*, 124 Hawai'i 43, 52, 237 P.3d 1109, 1118 (2010) ("Consistent with the prohibition against reprosecution following an acquittal, double jeopardy presents an absolute bar to retrial where, inter alia, the defendant has been acquitted, whether expressly or impliedly, notwithstanding a subsequent reversal of the judgment on appeal[.]") (internal citation and quotation marks omitted).

statement, and is therefore not fruit of the poisonous tree. Accordingly, I respectfully dissent.[1]

This court has held, "As for the suppression of derivative evidence, the fruit of the poisonous tree doctrine prohibits the use of evidence at trial which comes to light *as a result of the exploitation of a previous illegal act of the* police." *State v. Fukusaku*, 85 Hawai'i 462, 475, 946 P.2d 32, 45 (1997) (citation and quotation marks omitted) (emphasis added). In *State v. Joseph*, this court explained:

> As applied to confessions, the "fruit of the poisonous tree" doctrine holds that where one confession or admission is illegally obtained and subsequently the defendant makes a further confession, the second confession is inadmissible in evidence as a "fruit of the poisonous tree" *if it results from an exploitation of the prior illegality.* However, a confession made subsequent to an inadmissible one is not automatically inadmissible. Where a confession has been illegally obtained, *the government will not be allowed to introduce into evidence a subsequent confession unless it first demonstrates that the latter was not obtained by exploiting the initial illegality or that any connection between the two had become so attenuated that the taint was dissipated.*

109 Hawai'i 482, 499, 128 P.3d 795, 812 (2006) (quoting *State v. Pebria*, 85 Hawai'i 171, 175, 938 P.2d 1190, 1194 (App.1997)) (emphasis added).

As the majority acknowledges, both *State v. Luton*, 83 Hawai'i 443, 927 P.2d 844 (1996), and *Joseph* provide guidance in the instant case. In *Luton*, this court held that a defendant's post-*Miranda* confession was admissible because it did not result from the exploitation of a prior, illegal confession. 83 Hawai'i at 455, 927 P.2d at 856. There, the police received a report of a stabbing in Waikiki. *Id.* at 446, 927 P.2d at 847. The victim's daughter stated that she saw a black male with a ponytail run out of her mother's bedroom. *Id.* An officer spotted defendant

Luton, who matched the description, and attempted to speak with him. *Id.* Luton fled into the ocean. *Id.* Officers then apprehended Luton and brought him ashore. *Id.* While he was being arrested, Officer Medeiros heard Luton say: "We've all got to make a living somehow, I needed the money, just kill me already.... I didn't do it, it was someone else." *Id.* Officer Medeiros then questioned Luton about the stabbing incident and Luton responded that a person named "Max" committed the offense. *Id.* The next day, Luton was informed of his constitutional rights, waived them, and confessed to the stabbing. *Id.* at 447, 927 P.2d at 848. Luton was subsequently charged with murder in the second degree and burglary in the first degree. *Id.* Luton filed a motion to suppress the evidence, arguing that his statements to the officers were not voluntary. *Id.* The circuit court suppressed Luton's pre- and post-*Miranda* admissions. *Id.* The State only appealed the circuit court's suppression of Luton's post-*Miranda* statement. *Id.* On appeal, Luton argued that his pre-*Miranda* admissions tainted his subsequent confession and, therefore, the waiver of his constitutional rights was ineffective. *Id.* at 454–55, 927 P.2d at 855–56. This court disagreed and held:

> [T]here [wa]s no indication in the record that HPD detectives exploited Luton's illegally obtained statements to Officer Medeiros. Nor [wa]s there evidence to support a claim that officers used those statements to induce Luton into making a confession. The transcripts and the videotaped interview of Luton with Detectives Kinimaka and Dung [we]re devoid of any mention of the admissions Luton made on the beach. Therefore, we do not agree with Luton that his "subsequent statements ... flowed from the fact that the initial incriminating statements [made to Officer Medeiros] had already been obtained...." *We hold that Luton's waiver was not predicated on the statements made to Officer Medeiros.*

*Id.* at 455, 927 P.2d at 856 (emphasis added).

In contrast, this court held in *Joseph* that a post-*Miranda* confession was inadmissible

---

1. However, I concur in Part III of the Majority Opinion, which rejects Eli's argument that any statements obtained after an unrecorded waiver should be per se inadmissible where recording was feasible.

as fruit of the poisonous tree. 109 Hawai'i at 499, 128 P.3d at 812. There, the detective conducted a pre-*Miranda* interview with defendant Joseph that lasted "approximately twenty-two minutes," which involved questioning about the incident for which Joseph was being detained. *Joseph*, 109 Hawai'i at 486, 495, 128 P.3d at 799, 808 (citation omitted). After providing incriminating statements in the pre-interview, Joseph was subsequently read his *Miranda* rights and asked to make a statement on the record. *Id.* at 499, 128 P.3d at 812. The detective explicitly stated, "[W]e gotta have [the statement] on record." *Id.* Joseph was subsequently charged with various murder and firearm offenses. *Id.* at 487–88, 128 P.3d at 800–01. Joseph filed a motion to suppress both the pre- and post-*Miranda* statements because "neither the statement nor his waiver of his right to remain silent were voluntarily made." *Id.* at 488, 128 P.3d at 801. The circuit court suppressed both statements. *Id.* at 492, 128 P.3d at 805. On appeal of the circuit court's suppression order, the prosecution argued that the circuit court erred in suppressing Joseph's statements. *Id.* In regard to the post-*Miranda* statement, this court held that "[t]he pre-interview statements were exploited in that Joseph was subsequently questioned on the same matter in order that he would repeat his earlier statement." *Id.* at 499, 128 P.3d at 812. Accordingly, this court concluded that the post-*Miranda* statements were inadmissible. *Id.*

To summarize, under *Luton* and *Joseph*, a post-*Miranda* statement will be excluded if "it results from the exploitation of the prior illegality[,]" or there is no attenuation to dissipate the taint of any illegally obtained prior confession. *Joseph*, 109 Hawai'i at 499, 128 P.3d at 812; *see also Luton*, 83 Hawai'i at 455, 927 P.2d at 856. This court has recognized that exploitation can occur where a prior illegal confession is "used" to "induce" the defendant into making a subsequent confession, and where the subsequent confession is "predicated" on the prior confession. *Luton*, 83 Hawai'i at 455, 927 P.2d

at 856. In addition, this court has recognized that exploitation can occur where the defendant is questioned during his subsequent confession "on the same matter in order that he would repeat his earlier statements." *Joseph*, 109 Hawai'i at 499, 128 P.3d at 812. I respectfully disagree with the majority's conclusion that such exploitation occurred in the instant case.

First, unlike *Luton*, there is nothing in the record here to indicate that the detective "exploited" Eli's pre-*Miranda* response that he was willing to be interviewed, since the detective did not mention Eli's pre-*Miranda* response in the post-*Miranda* interview. There is also no indication that the detective used Eli's pre-*Miranda* response to "induce" Eli's subsequent waiver and confession. Again, there is nothing in the record to show that the detective mentioned Eli's pre-*Miranda* response in the discussion of Eli's *Miranda* rights or the post-*Miranda* interview. *Cf. Pebria*, 85 Hawai'i at 175–77, 938 P.2d at 1194–96 (affirming the suppression of a post-*Miranda* confession when the detective "diligently" tried to get the defendant to confess as he did in a pre-*Miranda* statement, led the defendant to make an admission based on the defendant's prior statement, and mentioned defendant's prior statement). Similarly, there is no indication in the record that Eli was motivated to give his post-*Miranda* confession because of his pre-*Miranda* response that he was willing to be interviewed. To the contrary, Eli stated that he made his confession "for [his] daughter." [2] Thus, Eli was aware that he had a right not to give a statement, despite his prior indication that he was willing to do so. Accordingly, as in *Luton*, the record does not support the conclusion that Eli's waiver of his right to remain silent and subsequent confession was directly "predicated" on his pre-*Miranda* response to the detective's inquiry. Instead, the record shows that Eli's pre-*Miranda* response was not exploited in order to obtain his subsequent statement. *Luton*, 83 Hawai'i at 455, 927 P.2d at 856.

2. Moreover, the *Miranda* warnings form that Eli signed stated, "If you decide to answer my questions without an attorney being present, you still have the right to stop answering at any time." Eli therefore acknowledged that he had a right to stop the post-*Miranda* interview at any time.

In addition, the instant case is distinguishable from *Joseph*. In *Joseph*, the detective explicitly exploited Joseph's pre-*Miranda* admissions when the detective told Joseph that he needed to restate his pre-*Miranda* confession "on record." 109 Hawai'i at 499, 128 P.3d at 812. Here, at no time did the detective use Eli's willingness to make a statement to induce Eli to waive his rights or confess. Additionally, in *Joseph*, the detectives engaged in "twenty-two minutes" of questioning about the incident prior to giving Joseph the *Miranda* warnings, and the post-*Miranda* questioning "sought a repetition and expansion of information provided during the pre-*Miranda* session." *Id.* at 490, 128 P.3d at 803. In contrast, here, Eli did not confess to the charged offense prior to being read his *Miranda* rights, and instead only indicated that he was willing to make a statement. Only after being read his *Miranda* rights did Eli provide the officers with a statement about the incident.

Our cases clearly require that a pre-*Miranda* statement be exploited before a subsequent post-*Miranda* statement will be considered fruit of the poisonous tree. *See Luton*, 83 Hawai'i at 455, 927 P.2d at 856; *Joseph*, 109 Hawai'i at 499, 128 P.3d at 812. In the present case, there was no such exploitation of Eli's pre-*Miranda* response. I would therefore hold that Eli's post-*Miranda* waiver and confession were admissible because they were not obtained from an exploitation of Eli's pre-*Miranda* indication that he was willing to make a statement. Accordingly, I would affirm the conviction.[3]

**Dissenting Opinion by NAKAYAMA, J., in which RECKTENWALD, C.J., Joins.**

Because I disagree with the majority's conclusion that the Honolulu Police Department ("HPD") detective's initial question to petitioner/defendant-appellant Pulumata'ala Eli on October 27, 2007 constituted custodial interrogation for which *Miranda* warnings were required, and because I therefore also disagree that the asking of the initial question was an illegality that rendered Eli's statement inadmissible at trial under the fruit of the poisonous tree doctrine, I respectfully dissent.

On October 31, 2007, Eli was indicted by a grand jury for Attempted Murder in the Second Degree. This charge was based on an incident that took place on October 24, 2007, wherein Eli "assaulted and seriously injured his seven-month-old [baby] daughter ... at Ala Moana Beach Park." Specifically, "[Eli] allegedly slapped [the] infant's head four times and threw her against the car passenger seat several times." On October 27, 2007, Eli turned himself in at Kapi'olani Hospital and was arrested there and transported to the main police station by HPD.

At the police station, the detective identified himself to Eli, told Eli "that he [had been] arrested for the assault on his seven-month-old daughter," and "may have asked [Eli] whether he would like to speak to [the detective] and tell his side of [the] story." At that point, the detective had not given Eli any *Miranda* warnings, but also had not asked Eli any questions about the case. Eli indicated that he was willing to make a statement, at which time the detective began audio recording the interview. The detective first asked Eli background questions, including Eli's level of education and ability to understand English, as well as whether Eli was rested, feeling well, and had a clear mind. The detective determined that Eli was competent to make a statement and then warned Eli of his *Miranda* rights using a standard HPD Form 81, entitled "Warning Persons Being Interrogated Of Their Constitutional Rights." The detective had one copy of Form 81 and read it aloud while Eli had another copy of the form and read along. Eli then initialed the form, indicating that he understood his rights as told to him, he did not want an attorney, and he was willing to make a statement. As Eli related in his statement, after parking his van at Ala Moana Beach Park, he and his girlfriend got into an argument about their relationship. During this argument, Eli's daughter was crying and would not stop; in an attempt to quiet

---

3. Eli raises several issues relating to sentencing that would need to be addressed if the conviction were affirmed. However, because the majority vacates Eli's conviction and remands for a new trial, I do not address the other issues raised by Eli.

his daughter, Eli hit her feet and the back of her head four times. Eli also stated that he removed her from her car seat and then dropped her back on the car seat by accident. At some point after that, Eli "threw her on her [car] seat" two times and she "stopped crying [and] stopped breathing[.]" After this happened, Eli drove his daughter to Kapiʻolani Hospital. At the end of the interview, Eli confirmed to the detective that he had made his statement voluntarily and that no one had either promised Eli anything or coerced, threatened, or forced him to make his statement.

On June 9, 2009, the State filed a motion to determine the voluntariness of Eli's statement, and the circuit court held a hearing on the motion on June 12, 2009. Based on the detective's testimony during direct and cross-examination and receipt of Eli's HPD Form 81 into evidence, the court concluded:

> Based on the evidence that's presented to the [c]ourt, the [c]ourt finds that the statement made by defendant Eli was done voluntarily, knowingly, and intelligently. Now, the [c]ourt notes that although he admitted that his primary language is Samoan, it's pretty clear that the defendant understood what he was told. The initial—the respective boxes—he signed the bottom of the form and his answers were—his answers related to the subject matter of the questions being asked.
>
> So therefore, the [c]ourt finds that the statement was voluntarily, intelligently, and knowingly made and, therefore, the [c]ourt does find that the State can admit that evidence or use the statement at trial.

A jury trial was held thereafter, and the jury found Eli guilty of attempted manslaughter. The jury also found that Eli "inflicted serious bodily injury upon a person who was eight years or younger" and "knew or reasonably should have known that said person was eight years or younger[.]"

On appeal to this court pursuant to our acceptance of Eli's application for transfer, Eli argued in pertinent part that "he was subjected to interrogation during a 'pre-interview' without being advised of his *Miranda* rights." Majority Opinion at 518, 273

P.3d at 1204. The majority concludes that because Eli

> was advised he was under arrest for assault, and his child was in the hospital allegedly due to his acts, [the detective] should have known that asking [Eli] for his side of the story and indicating that it was his chance to give that story was 'reasonably likely' to elicit an incriminating response; in other words, it was reasonably likely that the detective's question and statement solicited [Eli] to speak about the circumstances of the case that had resulted in his arrest.

Majority Opinion at 522–23, 273 P.3d at 1208–09. The majority thus holds that "[i]n inviting [Eli] to speak and in obtaining his commitment to do so before *Miranda* warnings were given, the police elicited statements without informing [Eli] of the consequences of his waiving his right to remain silent and the entire panoply of rights such a commitment involved." Majority Opinion at 523, 273 P.3d at 1209. The majority also holds that the circuit court "erred in determining that the question and statement by the detective were merely 'preliminary.'" Majority Opinion at 523, 273 P.3d at 1209.

As an initial but critical matter, I believe the majority errs in failing to regard the detective's initial question to Eli as strictly a preliminary one. Instead, the majority characterizes the detective's initial question as a "pre-interview" for which, according to the holding of this court in *State v. Joseph*, 109 Hawaiʻi 482, 128 P.3d 795 (2006), Eli's *Miranda* rights attach and require that the requisite warnings be given. Majority Opinion at 513, 273 P.3d at 1199. Under *Joseph*, it is true that the police cannot engage in a "pre-interview" in which a defendant is allowed to make incriminating statements without having been given *Miranda* warnings, only to then be given warnings and encouraged to repeat the same incriminating information during a "formal" or post-*Miranda* interview, *see Joseph*, 109 Hawaiʻi at 499, 128 P.3d at 812; the present case, however, is clearly distinguishable from *Joseph*.

In *Joseph*, this court affirmed the order of the circuit court suppressing Joseph's statements made to HPD during a "pre-inter-

view." 109 Hawai'i at 483–84, 128 P.3d at 796–97. In that case, Joseph had voluntarily surrendered to police in connection with a shooting that had happened earlier on the same day. *Id.* at 484, 128 P.3d at 797. Joseph was arrested and detained by HPD at the main police station; the next day, Joseph's attorney informed HPD Detective Osmond that Joseph wanted to make a statement. *Id.* After Joseph's attorney arrived at the police station, he and Joseph first had a private meeting; when the attorney informed Osmond and HPD Detective Tamashiro that Joseph was ready to give a statement, the two detectives entered the room, turned on video recording equipment, and began to engage in a "pre-interview discussion" with Joseph. *Id.* This pre-interview lasted approximately twenty-two minutes, went into considerable depth regarding the events at issue in the case, and included certain incriminating statements that Joseph later moved to have suppressed. *See id.* at 484–487, 128 P.3d at 797–800. Between the pre-interview and a "formal interview" that was conducted immediately thereafter, the detectives then asked Joseph some background questions, gave him HPD Form 81, and advised him of his *Miranda* rights. *Id.* at 487, 128 P.3d at 800. The post-*Miranda* formal interview lasted one hour and twenty minutes, and as the circuit court noted in its findings of fact filed in connection with Joseph's motion to suppress, "[t]he detectives' post-Miranda questioning sought a repetition and expansion of information provided during the pre-Miranda session." *Id.* at 490, 128 P.3d at 803. Accordingly, this court held on appeal that "Joseph should have been warned of his right to remain silent prior to the pre-interview." *Id.* at 493, 128 P.3d at 806. We further held that "[b]ecause he was not provided such warnings, all statements obtained from him must be suppressed, along with the fruits of the pre-interview statements." *Id.* (citing *State v. Pebria*, 85 Hawai'i 171, 174–75, 938 P.2d 1190, 1193–94 (App.1997)). This case is clearly distinguish-

able from *Joseph.* In *Joseph,* suppression was affirmed because "the statement obtained from Joseph in the pre-interview was obtained in violation of his right to remain silent. The pre-interview statements were exploited in that Joseph was subsequently questioned on the same matter in order that he would repeat his earlier statement." *Id.* at 499, 128 P.3d at 812. In this case, what this court has referred to as a "pre-interview" never took place. In *Joseph,* which the majority relies on in support of its position, Joseph made incriminating statements without having been informed of his *Miranda* rights and without having validly waived his right to remain silent. Once the police detectives were aware of the incriminating statement, they then finally Mirandized Joseph[1] and conducted the "formal" interview so as to ensure that the incriminating statements made by Joseph in the pre-*Miranda* "pre-interview" would be repeated. Here, when the detective began talking with Eli, the only question asked was whether Eli was willing to make a statement. When Eli answered that he was, the detective did not ask Eli anything other than straightforward background questions until informing Eli of his *Miranda* rights using HPD Form 81, which Eli understood, acknowledged, and waived. Only then did the detective ask Eli questions likely to produce an incriminating response, i.e., questions related to Eli's involvement in the alleged criminal assault of his daughter.

Because, as this court held in *State v. Naititi*, 104 Hawai'i 224, 227, 87 P.3d 893, 896 (2004), preliminary questions to a defendant do not constitute custodial interrogation, I would hold that the circuit court did not err in determining that the detective properly conducted the interview by informing Eli of his constitutional rights before Eli made any statements, that Eli understood and validly waived his rights, and that Eli intelligently, knowingly, and voluntarily made his statement concerning his commis-

---

1. In fact, the detectives acknowledged this to be their procedure, insofar as Detective Tamashiro admitted on cross-examination during the trial:
   Q. *You didn't Mirandize him in that first meeting?*

   A. *No, we didn't until we obtained the statement.*
   *Joseph,* 109 Hawai'i at 496, 128 P.3d at 809 (emphases in original).

sion of the assault on his seven-month-old daughter.

In *Naititi*, the circuit court had determined Naititi's statements to be involuntary and therefore inadmissible at trial. 104 Hawai'i at 227, 87 P.3d at 896. On appeal, this court vacated the circuit court's order and remanded for further proceedings on the grounds that Naititi's statements were voluntary and, because Naititi was in custody but not yet subject to interrogation, *Miranda* warnings were not required before the statements were made. *Id.* at 227–28, 87 P.3d at 896–97. In that case, HPD Detective Lavarias, through an American Sign Language interpreter, asked Naititi, who was deaf and mute, "whether he wished to make a statement and be afforded the assistance of an attorney." *Id.* at 237, 87 P.3d at 906. Significantly, we stated that *"[b]y no stretch of the imagination could these preliminary 'yes-or-no' questions be construed as the type that Detective Lavarias 'should have known … were reasonably likely to elicit an incriminating response' from Naititi."* *Id.* (quoting *State v. Ketchum*, 97 Hawai'i 107, 121, 34 P.3d 1006, 1020 (2001); *State v. Ikaika*, 67 Haw. 563, 567, 698 P.2d 281, 284 (1985)) (emphasis added). Thus, when Naititi signed answers that were non-responsive to Lavarias's questions, signed to Naititi through the interpreter, we noted that "Lavarias immediately ceased further questioning and terminated the interview, thereby never reaching the point at which custodial interrogation, necessitating *Miranda* warnings, commenced." *Id.* at 237–38, 87 P.3d at 906–07. Although the interview in *Naititi* was terminated while the interview here was conducted in full, the logic of *Naititi* still applies; that case is not "inapplicable" as the majority suggests. Majority Opinion at 521 n. 19, 273 P.3d at 1207 n. 19. Here, the detective began by introducing himself, explaining to Eli why he was under arrest, and asking whether Eli wanted to make a statement; at that point, Eli voluntarily agreed to make a statement. The detective then properly reviewed HPD Form 81 with Eli and informed him of his constitutional rights, including the right to remain silent, the right to have an attorney present, and the right to terminate the interview at any time. The detective also confirmed that Eli was competent to make a statement. Eli, having understood his rights as read to him, again confirmed that he wanted to make a statement and that he was not requesting an attorney. Only *after* Eli had been informed of and waived his *Miranda* rights did the detective begin to ask Eli about the alleged assault of his daughter, i.e., ask questions "likely to elicit an incriminating response" from Eli. This court has held that interrogation "involves any practice reasonably likely to invoke an incriminating response without regard to objective evidence of the intent of the police[.]" Majority Opinion at 522, 273 P.3d at 1208 (quoting *Joseph*, 109 Hawai'i at 495, 128 P.3d at 808). Under *Naititi*, as discussed, Eli's *decision to make a statement* made in response to the detective's preliminary question is not the same thing as *an actual statement* (for which *Miranda* warnings must be given, as they were here); thus, a defendant's statement that he or she will make a statement is not in and of itself an incriminating response.

The majority attempts to distinguish *Naititi*, and to underline its decision in the present case, by pointing to the detective's additional statement that the interview was a chance for Eli to give "his side of the story." Majority Opinion at 514, 516, 273 P.3d at 1200, 1202. The majority concludes that "[b]y asking [Eli] if he wanted to give his side of the story without first stating the *Miranda* warnings, [the detective] violated [Eli]'s right to be informed of his right to remain silent before making the decision and commitment to give a statement." Majority Opinion at 523, 273 P.3d at 1209. In my view, this disregards the long-standing requirement that we must examine the totality of the circumstances surrounding the interview in determining the voluntariness of a defendant's statement. As we have stated, when reviewing a trial court's decision to admit a defendant's statement as voluntary, we are "required to examine the entire record and make an independent determination of the ultimate issue of voluntariness based on the totality of [the] circumstances." *State v. Kekona*, 77 Hawai'i 403, 406, 886 P.2d 740 (1994) (citing *State v. Kelekolio*, 74 Haw. 479, 502, 849 P.2d 58, 69 (1993)). In

*Kekona,* we affirmed the circuit court's rulings that Kekona's statement was made voluntarily and that he did not invoke his right to remain silent. *Id.* at 404, 886 P.2d at 741. There, we noted that the circuit court determined during a suppression hearing that Kekona had understood and validly waived his *Miranda* rights. *Id.* at 406, 886 P.2d at 743. In Kekona's case, the Maui Police Department detectives had produced a form similar to HPD Form 81 and read the entire form aloud while Kekona read along; the detectives also explained to Kekona his constitutional rights and the waiver provisions "prior to Kekona signing the form." *Id.* We also concluded that Kekona's statement was voluntarily made because "[t]he conditions surrounding Kekona's interrogation do not suggest that any impermissible tactics were employed by the detectives to coerce Kekona into making a statement." *Id.* Here, a review of the record and the totality of the circumstances of the interview do not suggest that the detective's comment about the interview being a chance for Eli to "tell his side of the story" impermissibly coerced Eli into making a statement or waiving *Miranda* warnings that at that preliminary point were not required to be given. After Eli initially indicated that he was willing to make a statement and before the detective asked any questions about the case, the detective properly informed Eli of his *Miranda* rights, read all of HPD Form 81 aloud while Eli read along, and specifically confirmed that Eli agreed to make a statement voluntarily and of his own free will and that Eli did not request the presence of an attorney. At any point prior to his actual statement, Eli could have invoked his right to remain silent and not speak about the case; the record reveals that Eli understood his rights and validly waived them in deciding to tell the detective about the events of the case. In fact, at the end of the interview, Eli again confirmed that he had made his statement voluntarily and even told the detective, "I doing this for my daughter." Furthermore, as the record shows, at no point did Eli exercise his right to terminate the interview. Consequently, I would not hold that the circuit court clearly erred in its determination that Eli validly waived his rights and voluntarily made his statement to the detective.

Because I do not conclude that Eli's statement was obtained in violation of *Miranda,* I would therefore also hold that the statement was not rendered inadmissible at trial pursuant to the fruit of the poisonous tree doctrine. As the statement was made pursuant to a valid waiver of Eli's *Miranda* rights after he had properly been informed of them by the detective, no pre-*Miranda* illegality occurred to taint Eli's statement and preclude its admission and use at trial.

Accordingly, for the foregoing reasons, I would affirm the judgment of the circuit court.