*** FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER ***

**Electronically Filed
Supreme Court
SCWC-23-0000376
17-SEP-2025
12:34 PM
Dkt. 53 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

STATE OF HAWAI'I,
Respondent/Plaintiff-Appellee,

vs.

CHARLES ZUFFANTE,
Petitioner/Defendant-Appellant.

SCWC-23-0000376

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-23-0000376; CASE NO. 3CPC-22-0000315)

SEPTEMBER 17, 2025

McKENNA, EDDINS, AND DEVENS, JJ.; WITH RECKTENWALD, C.J.,
CONCURRING IN PART AND DISSENTING IN PART;
AND GINOZA, J., DISSENTING

OPINION OF THE COURT BY EDDINS, J.

Today, police stations are equipped to record custodial interrogations. Outside the station, police officers record interactions with suspects through cameras attached to their bodies. And throughout society, recording devices are modern appendages, attached to most hands.

Unrecorded interrogations frustrate the judiciary's truth-detecting mission and mute rights promised by the Hawai'i Constitution.

We conclude that recording is a necessary procedural safeguard that protects the right against self-incrimination, right to confrontation, and right to a fair trial.

We hold that the Hawai'i Constitution's due process clause requires law enforcement to record in-station custodial interrogations. We also hold that article I, section 5 of the Hawai'i Constitution requires the recording of outside-the-station custodial interrogations when feasible.

Thus, we recognize a new constitutional rule and overrule State v. Kekona, 77 Hawai'i 403, 886 P.2d 740 (1994).

## I.

On October 20, 2021, in Kona, Hawai'i, two police officers stopped a car with an expired registration. Charles Zuffante sat in the passenger seat. His girlfriend was the driver and owned the car.

During the stop, the officers noticed a glass pipe in the front center cupholder. The officers arrested Zuffante and his girlfriend. After the arrest, they searched Zuffante and found 3.5 grams of methamphetamine in his pocket. The officers recorded the event with their body-worn cameras. Later, after obtaining a search warrant for the car, the police recovered 130

grams of methamphetamine stored in four places: a Bebe handbag, black and white polka dot coin purse, sunglasses case, and fanny pack.

The next day, a detective interrogated Zuffante. Zuffante signed an "Advice of Rights" form. He waived his right to counsel and right against self-incrimination. The Miranda advisements and questioning occurred in the Kona police station's interrogation room. Zuffante does not contend that the warnings were deficient or that he unknowingly or involuntarily waived his rights.

Only Zuffante and the detective were in that room. Though the police equipped the interrogation site with video recording equipment, no video or audio preserved the interrogation. "The audio/video recording equipment was inoperable," the detective claimed. Zuffante figured the detective had recorded the interrogation. "I mean they have the camera right there[,]" he later testified.

The detective did not note-take. One week later, he wrote a report that purportedly paraphrased and quoted Zuffante.

Zuffante moved in limine to preclude the State from presenting the detective's testimony about Zuffante's statements during his interrogation. Allowing the jury to hear the detective's uncorroborated testimony as to what he had supposedly said during the interrogation violated his right to a

fair trial, Zuffante argued.  He urged the circuit court to adopt Stephan v. State, 711 P.2d 1156 (Alaska 1985), a case rejected by State v. Kekona.

Stephan held that Alaska's due process clause requires law enforcement to record custodial interrogations.  711 P.2d at 1158.  Though both Kekona's majority and dissenting opinions voiced support for recording in-station custodial interrogations, the majority declined to follow Stephan and mandate recording as a due process requirement.  Kekona, 77 Hawai'i at 409, 886 P.2d at 746 ("[W]e do not agree that the due process clause of our State Constitution requires such a practice.").

The circuit court denied Zuffante's motion.

At trial, the detective claimed that Zuffante confessed to possessing all the methamphetamine recovered from his girlfriend's car.  According to the detective, Zuffante confessed that "everything" belonged to him, and "all the meth was his."  Zuffante also admitted "that he sells the crystal methamphetamine."  Defense counsel's cross-examination did not budge the detective.

The detective repeated his account during redirect.  As Zuffante sat next to his lawyer during this testimony, he interrupted.  "That's a lie," he insisted.

Q.    . . . [D]id you clarify what he meant by "everything"?

A.    Yes, ma'am.

Q.    And did he say a particular substance?

A.    Yes.

Q.    And what did he say?

THE DEFENDANT:  That's a lie.

A.    All the meth was his.

. . . .

Q.    (By [Deputy Prosecuting Attorney]) And did he use "meth"?

THE DEFENDANT:  That's a lie.

. . . .

Q.    Did he use the exact term "meth"?

A.    Yes, ma'am.

After the detective testified, the State rested.  The defense offered no witnesses.  Before it rested, the court advised Zuffante of his right to testify and right not to testify.  See Tachibana v. State, 79 Hawai'i 226, 236, 900 P.2d 1293, 1303 (1995); State v. Torres, 144 Hawai'i 282, 285, 439 P.3d 234, 237 (2019).  Zuffante informed the court that he wanted to testify.  "My decision is to testify and tell the Court what happened."

Zuffante contradicted the detective.  He denied confessing that "all the meth" in the car was his.  He told the jury he didn't know what was in his girlfriend's car.  He explained that there were no questions about the contents of the Bebe handbag, polka dot coin purse, sunglasses case, or fanny pack:

5

Q. Did Officer Gaspar ask you about your knowledge of the contents of any of the items that were found to contain illegal drugs?

A. Only the vehicle.

. . . .

Q. [D]id he ask you about . . . your knowledge of the contents of anything in any of the five items that contained . . . illegal drugs?

A. No, ma'am.

Zuffante also related that he only told the detective that he had sold methamphetamine because he wanted to protect his girlfriend.

The jury found Zuffante guilty as charged of promoting a dangerous drug in the first degree, Hawai'i Revised Statutes (HRS) § 712-1241(1)(a) (Supp. 2016); attempted promotion of a dangerous drug in the first degree, HRS §§ 705-500 (2014), 712-1241(1)(b)(ii); and promoting a dangerous drug in the second degree, HRS § 712-1242(1)(b) (Supp. 2016). The court sentenced Zuffante to a twenty-year prison term.

Zuffante appealed. He challenged the admission of the detective's testimony regarding his statements, and argued that the failure to record undermined his right against self-incrimination. And like his motion in limine, he urged this court to revisit Kekona and adopt Stephan's recording requirement.

The ICA affirmed the circuit court. Zuffante appealed. We accepted cert.

6

**II.**

We hold that the Hawai'i Constitution's due process clause requires law enforcement to record all in-station custodial interrogations and to record, when feasible, all outside-the-station custodial interrogations.

The Hawai'i Constitution's imperative: "[n]o person shall be deprived of life, liberty or property without due process of law," reads like the United States Constitution's Fifth and Fourteenth Amendments. Haw. Const. art. I, § 5. Like the Fourteenth Amendment, our constitution demands equal protection of the laws. U.S. Const. amend. XIV, § 1. Article I, section 5 does more, though, than its federal counterpart. It protects against denial of a person's civil rights and discrimination based on race, religion, sex, or ancestry. Haw. Const. art. I, § 5.

Hawai'i's due process clause also operates differently. Article I, section 5 of the Hawai'i Constitution offers safety to Hawai'i's people that exceeds the federal constitution's suddenly fluid protections. State v. Bowe, 77 Hawai'i 51, 58, 881 P.2d 538, 545 (1994) ("Although the due process clause of the Hawai'i Constitution is modeled after the fourteenth amendment to the United States Constitution, the due process protection under our state constitution is not necessarily limited to that provided

by the United States Constitution."); State v. Matafeo, 71 Haw. 183, 185-87, 787 P.2d 671, 672-73 (1990) (no bad faith requirement for due process violation when State fails to preserve material evidence; contra Arizona v. Youngblood, 488 U.S. 51 (1988)); see generally Dobbs v. Jackson Women's Health Org., 597 U.S. 215 (2022) (erasing a generations-long constitutional right, stripping autonomy from half the population, and empowering states to force birth).

No United States Supreme Court opinion has tackled the recording of custodial interrogations.  If a case did though, we would still look to our state constitution first.  State v. Wilson, 154 Hawai'i 8, 13, 543 P.3d 440, 445 (2024).

We believe that requiring law enforcement to record custodial interrogations animates the right to confrontation and the right against self-incrimination.

First, requiring police to record interrogations safeguards the right against self-incrimination.  Here, the lack of a recording undermined Zuffante's ability to freely and voluntarily choose between testifying and not testifying. Zuffante had no true choice but to testify, or remain silent and allow the police officer's testimony to go unchallenged by evidence other than the officer's own testimony.  We add to the safeguards this court has developed to advance article I, section 10's right against self-incrimination.

Second, the article I, section 14 right to confrontation allows defendants to challenge the prosecution's evidence. But when the only evidence of an alleged statement's content, context, and backdrop is a police officer's recall, cross-examination gets much harder. Recording custodial interrogations provides an objective account and complete information to enhance meaningful cross-examination. It furthers the right to confrontation.

Beyond supporting Hawai'i's constitutional provisions, requiring police to record interrogations promotes accurate and sound decision-making. Because recordings offer judges and juries better evidence compared to human memory, they improve reliability in fact-finding – advancing the Judiciary's core truth-detecting mission. See-and-hear-for-yourself evidence also streamlines voluntariness hearings and trials, thereby increasing judicial efficiency.

We believe that a defendant's article I, section 5 right to a fair trial is undermined unless police record an accused's custodial interrogation.

Thus, we hold that due process requires that all in-station custodial interrogations be recorded, and that all outside-the-station custodial interrogations be recorded when feasible.

For purposes of this opinion, "recording" means a simultaneous video and audio recording of the interaction. We

note that the term "videorecording," like the older "videotape recording" may soon become outdated – and may already be.  Our decision thus accounts for technological advances, and requires video and audio recordings consistent with prevalent recording practices.

We begin with the right against self-incrimination.

**A.   The lack of an interrogation recording undermined Zuffante's article I, section 10 right against self-incrimination**

Video and audio evidence unburdens the defendant's decision to testify or not testify at trial.

Absent recording, the only evidence the jury hears about the interrogation comes from law enforcement – unless the defendant testifies.  With a recording, there is little need for a defendant to waive the right against self-incrimination just to counter police testimony about an interrogation.

We stop to address the dissent's procedural concerns.

**1.   Appellate review of constitutional issues**

The dissent feels that Zuffante didn't sufficiently raise or preserve arguments based on the right against self-incrimination and the right to confrontation.  It believes the State had no chance to address these constitutional arguments in their briefing.  So Zuffante is out of luck.

The dissent seems to conflate our plain error holding with our reasoning and holding that recording custodial

interrogations furthers the right to confrontation.  We find plain error based on the violation of Zuffante's right against self-incrimination.  Because the dissent argues that "no party had the opportunity to brief the court on whether these separate constitutional grounds support a mandate of recording custodial interrogations," though, we address the dissent's concern both in the plain error context and as a whole.

First, plain error.  The appellate court may not dispose of "an issue of plain error not raised by the parties through briefing."  See Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(b)(4).  Here, Zuffante repeatedly raised the right to a fair trial, and the right against self-incrimination in his briefing.  The State had ample opportunity to respond to or inform the court about these issues.

Before trial, Zuffante unsuccessfully moved in limine to exclude the detective's testimony relating to the unrecorded interrogation at the Kona station.  He quoted Justice Levinson's dissent in Kekona, and urged adoption of Alaska's Stephan rule.  Recording was essential to the protection of his right to counsel, right against self-incrimination, and right to a fair trial, Zuffante argued.  The State responded that Kekona applied and that "[n]either this case, nor the current times, warrant a reverse of [Kekona's rejection of the Stephan rule.]"  Zuffante's reply memorandum asked that the court adopt the

Stephan rule because "[Zuffante] has a constitutional right . . . to not be compelled to be a witness against himself."

On appeal, Zuffante again raised his self-incrimination and fair trial arguments. The State acknowledged his position, but did not directly engage. The ICA took a narrow approach, refusing to consider Zuffante's motion in limine arguments that advocated for adoption of Stephan's recording requirement. Zuffante also raised his self-incrimination argument before this court. The State chose not to file a response to Zuffante's cert application.

Two amicus briefs, one filed by the Hawai'i Innocence Project and the Innocence Project, and the other by the ACLU of Hawai'i Foundation and the American Civil Liberties Union Foundation, also discussed the self-incrimination issue. The State filed briefs in response to the amici. It had another chance to brief these constitutional issues as it saw fit. Last, at oral argument, both parties were questioned at length about the impact of a lack of recording on the right against self-incrimination. No. SCWC-23-0000376, Thursday, April 17, 2025, 10 a.m., State v. Zuffante, YouTube, Oral Argument, https://www.youtube.com/live/f06KVmJGC98 [https://perma.cc/RZ9L-SDGB]. The parties have had full and fair opportunity to argue

and brief this issue for the purposes of plain error review. See HRAP Rule 28(b)(4).

Second, the right to confrontation. The dissent seems to say that we should not examine the right to confrontation because Zuffante did not specifically raise article I, section 14 in relation to his Stephan rule arguments, and the parties did not have the opportunity to brief this issue. (Because we do not find plain error based on this constitutional provision, HRAP Rule 28(b)(4) does not apply here.)

We see no issue with considering closely-related constitutional provisions in our analysis of the defendant's right to a fair trial. While the ICA did not consider Zuffante's *circuit court* recording arguments preserved, Zuffante continued to argue on appeal that recording (and the Stephan rule) furthers the right to a fair trial. This court "will consider new arguments on appeal where justice so requires." State v. Moses, 102 Hawai'i 449, 456-57, 77 P.3d 940, 947-48 (2003). "[I]n the exercise of this discretion[,] an appellate court should determine whether the consideration of the issue requires additional facts, whether the resolution of the question will affect the integrity of the findings of fact of the trial court[,] and whether the question is of great public import." State v. Hicks, 113 Hawai'i 60, 74, 148 P.3d 493, 507 (2006) (citing State v. Kapela, 82 Hawai'i 381, 392 n.4, 922 P.2d

13

994, 1005 n.4 (App. 1996) (brackets in original)).  Here, we require no further facts to decide how recording protects constitutional rights, nor does our holding impact the integrity of the trial court's findings.  See id.

Issues involving article I, section 5 (due process), article I, section 14 (right to confrontation), and article I, section 10 (right against self-incrimination) of the Hawai'i Constitution and how police departments record custodial interrogations have great public importance.  See id.  The defendant, sentenced to twenty years, fairly presented legal arguments worthy of appellate consideration.

Zuffante's argument that recording custodial interogations protects the right to a fair trial subsumes an article I, section 14 right to confrontation argument.  If the right to confrontation is violated, then the right to a fair trial is typically violated.  Confrontation is an essential component of due process.  "It is well-settled that upholding a defendant's rights under the confrontation clause is essential to providing a defendant with a fair trial."  Birano v. State, 143 Hawai'i 163, 183, 426 P.3d 387, 407 (2018) (citation omitted); State v. Miranda, 147 Hawai'i 171, 179-82, 465 P.3d 618, 626-29 (2020) (precluding cross-examination of an adverse witness regarding a motive to lie violated defendant's right to confrontation, and therefore, his right to a fair trial).  We see no reason to

14

procedurally sever these complementary rights.  In interpreting the constitution, this court may consider related constitutional provisions.  See, e.g., City & Cnty. of Honolulu v. State, 143 Hawai'i 455, 469 n.21, 431 P.3d 1228, 1242 n.21 (2018) ("[T]his court interprets a constitutional provision in harmony with other constitutional provisions and 'in the light of the circumstances under which it was adopted.'").

### 2. Violation of Zuffante's right against self-incrimination constitutes plain error

"We apply the plain error standard of review 'to correct errors which seriously affect the fairness, integrity, or public reputation of judicial proceedings, to serve the ends of justice, and to prevent the denial of fundamental rights.'" State v. Hirata, 152 Hawai'i 27, 30, 520 P.3d 225, 228 (2022) (quoting State v. Williams, 146 Hawai'i 62, 72, 456 P.3d 135, 145 (2020)); Hawai'i Rules of Penal Procedure Rule 52(b) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.").

The detective's testimony retelling the interrogation affected Zuffante's substantial rights.  We hold that the lack of recording undermined Zuffante's ability to freely and voluntarily choose between testifying and not testifying.

"The choice to testify, or not, is the biggest decision a defendant makes at trial."  Hirata, 152 Hawai'i at 34, 520 P.3d

15

at 232.  Given its importance, "[o]ur courts do a lot to ensure this crucial call is made knowingly, intelligently, and voluntarily," such as requiring trial courts to advise the defendant of the right to testify, or not, and requiring courts to obtain on-the-record waivers of these rights.  Id.; Tachibana, 79 Hawai'i at 236, 900 P.2d at 1303; State v. Pomroy, 132 Hawai'i 85, 92-93, 319 P.3d 1093, 1100-01 (2014).

An accused's words matter.  Confessions have more impact on verdicts than other evidence.  See Arizona v. Fulminante, 499 U.S. 279, 296 (1991) ("A confession is like no other evidence. Indeed, the defendant's own confession is probably the most probative and damaging evidence that can be admitted against [them].") (cleaned up); Sara C. Appleby & Saul M. Kassin, When Self-Report Trumps Science: Effects of Confessions, DNA, and Prosecutorial Theories on Perceptions of Guilt, 22 Psych. Pub. Pol'y & L., 127, 127 (2016).

A defendant's words before trial, and live, testifying at trial, have a lopsided effect.  See State v. Robinson, 79 Hawai'i 468, 472, 903 P.2d 1289, 1293 (1995) ("A confession which has been shown by the state to be free from coercive conditions is among the strongest kind of physical evidence the prosecution may produce.") (quoting People v. Miller, 829 P.2d 443, 446 (Colo. App. 1991)); State v. Pauline, 100 Hawai'i 356, 373, 60 P.3d 306, 323 (2002) ("A witness's countenance, tone of voice,

16

mode and manner of expression, and general demeanor on the stand oftentimes influence the jury as much in estimating the weight they give and attach to his testimony as the words he utters.") (citation omitted).

The failure to record placed Zuffante in a constitutional bind. Let the detective's unverified testimony go uncontested, or waive his article I, section 10 right not to testify. Once the detective testified to his alleged confession, Zuffante had no real choice but to testify himself. This illusory choice — either remain silent and let decisive evidence go unchallenged, or testify to refute the testimony — dents the right against self-incrimination. When there's no recording to capture a custodial interrogation, an accused's right to make a free choice to testify or not is unfairly burdened. See Stephan, 711 P.2d at 1159-60; State v. Scales, 518 N.W.2d 587, 592 (Minn. 1994).

This court has protected the freedom of choice to testify at trial. In State v. Santiago, the defendant was accused of murdering a police officer. 53 Haw. 254, 255-56, 492 P.2d 657, 658-59 (1971). At trial, Santiago chose to testify. Id. at 256, 492 P.2d at 659. To impeach his credibility, on cross the prosecution asked him about priors. Id. Santiago answered that a "long time ago," at age twenty, he was convicted of burglary. Id.

17

Santiago held that admitting prior convictions burdens a defendant's right to testify:

> Admission of prior convictions to impeach credibility puts the criminal defendant who has prior convictions in a tremendous dilemma. [The defendant] knows that the jury will learn of [their] prior convictions only if [they] take[] the stand to testify in [their] own defense. [They] know[] that the jury may use [their] prior convictions in its determination of whether or not [they are] guilty. Any defendant who has prior convictions will therefore feel constrained not to take the stand.

Id. at 258, 492 P.2d at 660.

This court rejected that burden on a defendant's right to testify in their own defense. Id. at 260, 492 P.2d at 661. Santiago held that "[s]ince there is no compelling reason to impose that burden[] . . . to convict a criminal defendant where prior crimes have been introduced to impeach [their] credibility as a witness violates the accused's constitutional right to testify in [their] own defense." Id.

This court has often crafted constitutional rules to advance article I, section 10's right against self-incrimination. See, e.g., State v. Kelekolio, 74 Haw. 479, 849 P.2d 58 (1993) (extrinsic falsehoods per se coercive, so confession generated from that tactic involuntary); Bowe, 77 Hawai‘i 51, 881 P.2d 538 (the state participates in a private person's coercive acts to obtain an accused's confession by presenting those statements as evidence); Tachibana, 79 Hawai‘i 226, 900 P.2d 1293 (mandatory colloquy and on-the-record waiver

18

to protect right to testify); Pomroy, 132 Hawai'i 85, 319 P.3d 1093 (mandatory colloquy and on-the-record waiver to protect right not to testify); State v. Matsumoto, 145 Hawai'i 313, 452 P.3d 310 (2019) (deliberately falsifying results of a polygraph test per se coercive, so statements excluded); State v. Baker, 147 Hawai'i 413, 465 P.3d 860 (2020) (when interrogation shifts from investigatory to accusatory, coercive techniques may not induce a confession); State v. Hewitt, 153 Hawai'i 33, 526 P.3d 558 (2023) (reaffirming State v. Ketchum, 97 Hawai'i 107, 34 P.3d 1006 (2001), that Miranda warnings required when probable cause arises or there was a "de facto" arrest without probable cause).

Because the absence of a recording undermines article I, section 10's right against self-incrimination, we hold that law enforcement is required to record all in-station custodial interrogations, and all outside-the-station custodial interrogations when feasible.

The article I, section 10 constitutional safeguards complement article I, section 5's right to a fair trial.

We hold that the trial court's admission of the detective's testimony constituted plain error. The error seriously affected the fairness of Zuffante's trial.

B. **Recorded interrogations further the right to confrontation through meaningful cross-examination**

The right to confrontation is all about the right to

challenge evidence presented by the prosecution.  Testimony relating to an unrecorded confession may involve a statement touching facts of consequence, or assertions that undermine the defendant's credibility.  When the State presents testimony about an alleged confession, the accused is forced to confront not only an officer's recall of the defendant's words, but the circumstances under which those words were obtained.

Recording advances article I, section 14's promise to permit meaningful and potent cross-examination.  See State v. Nofoa, 135 Hawai'i 220, 349 P.3d 327 (2015) (only a meaningful right to cross-examination satisfies the right to confrontation).  Recording preserves the words, context, and tone of the interrogation for cross-examination.  A complete and exact account of an interrogation allows the defense to effectively and meaningfully challenge otherwise uncorroborated or unknown evidence.

Neutral, unfiltered evidence enhances the truth-detecting aim of cross-examination, and in turn, the right to confrontation.  "[I]ncreasing the evidence available to both parties[] enhances the fairness of the adversary system."  State v. Tetu, 139 Hawai'i 207, 220, 386 P.3d 844, 857 (2016) (quoting State v. Pond, 118 Hawai'i 452, 464, 193 P.3d 368, 380 (2008)).

Recording objectively preserves and authenticates an interrogation.  It creates an accurate account of the event.

Not only the words the participants speak, but the context and setting that frame those words. Recording offers the fact-finder the "best evidence available." State v. Jones, 49 P.3d 273, 279 (Ariz. 2002). Rather than listen to one-sided or competing views about what was said, how, and under what circumstances, judges and jurors may evaluate the interrogation's "precise contents." Commonwealth v. DiGiambattista, 813 N.E.2d 516, 532 (Mass. 2004).

Without recording, there is very little an accused may do to ably counter an officer's testimony. Elementary omission impeachment and other defense 101 techniques are largely ineffectual. Lisa Kern Griffin, False Accuracy in Criminal Trials: The Limits and Costs of Cross-Examination, 102 Tex. L. Rev. 1011, 1057 (2024) ("[O]ver-reliance on [cross-examination's] capacity to test credibility can lead to the exclusion of some valuable evidence, introduce misinformation via witness demeanor, diminish other procedural protections, and insulate errors from later review."). Cross-examination built upon a less-than-ideal evidentiary foundation is a poor substitute for start-to-finish, word-for-word evidence.

Because a recording captures the exact content and context of the interrogation, the factual information is known before an officer testifies. Thus, defense counsel does not have to

confront the mostly unknown.  Recording furthers article I, section 14's right to confrontation.

**C.    Requiring police to record interrogations improves transparency and reliability, and protects the integrity of the criminal justice system**

Recording supports the integrity of the criminal justice system.  Requiring law enforcement to record interrogations improves the reliability of evidence presented to judges and juries.  And outside the courtroom, it promotes transparency and accountability in law enforcement practices.

Today it's easy to know what defendants and police officers say to each other.  So if the prosecution uses a defendant's words against them, then our courts must ensure that the defendant really spoke those words.  Recorded interrogations protect the integrity of the judicial system.  Stephan, 711 P.2d at 1163-64.

Human memory is a suboptimal backup to video evidence.  Id. at 1161 ("Human memory is often faulty – people forget specific facts, or reconstruct and interpret past events differently.").  Recordings reliably authenticate the events that take place during custodial interrogation.  They verify whether police properly recited Miranda warnings.  And they validate whether a suspect knowingly, intelligently, and voluntarily waived the right against self-incrimination and the right to counsel.

Recordings are "obviously material in determining the voluntariness of a confession."  Id.

Recording creates a reliable and objective record of what was said, and the circumstances in which those words were spoken.  It limits credibility disputes between a police officer and defendant.  Kekona expressed that sentiment.

> Undeniably, recording a custodial interrogation is important in many contexts.  A recording would be helpful to both the suspect and the police by obviating the "swearing contest" which too often arises when an accused maintains that [they] asserted [their] constitutional right to remain silent or requested an attorney and the police testify to the contrary.

77 Hawai'i at 409, 886 P.2d at 746.

The County of Hawai'i Police Department's policy on body-worn cameras accurately observes that recording "provide[s] an objective record" and "may depict events differently than what is recalled by the officer":

> While recordings obtained from a [body-worn camera] provide an objective record of these events, video recordings . . . may depict events differently than what is recalled by the officer.  Specifically, it is understood the [body-worn camera] may capture information that may not have been heard and/or observed by the involved officer(s) and/or may not capture information observed by the officer(s).

Hawai'i Police Dep't General Order 818 (Mar. 29, 2022) at § 1.

Because recording provides a neutral record, it quickens judicial processes.  When a defendant challenges the voluntariness of their statements or the validity of their waiver of rights, courts are better suited to assess the totality of the circumstances after watching and hearing the

23

interrogation - from the Miranda rights reading to the encounter's end. See Baker, 147 Hawai'i at 416, 420, 424-32, 465 P.3d at 863, 867, 871-79 (reviewing the context of the defendant's statements under the totality of the circumstances based on a recording and transcript of the interrogation); Kekona, 77 Hawai'i at 409, 886 P.2d at 746 (recording "help[s] to demonstrate the voluntariness of the confession, the context in which a particular statement was made and of course, the actual content of the statement").

A recorded interrogation is helpful to resolve disputes about the defendant's invocation or waiver of the right to counsel. See State v. McKnight, 131 Hawai'i 379, 383, 319 P.3d 298, 302 (2013) (tape recorded interrogation showed that defendant agreed to continue the interview and waive his right to counsel after initially requesting an attorney); People v. Henderson, 470 P.3d 71, 77-79 (Cal. 2020) (a transcript of defendant's post-arrest interrogation recording showed that defendant properly invoked his right to counsel after initially waiving his Miranda rights).

Recordings reduce litigation over what happened during custodial interrogations; they streamline voluntariness hearings and trials. Stephan, 711 P.2d at 1162. And they largely eliminate "swearing contests" between police officers and defendants before and during trial. Defendants, who by status

alone tend to lose those stacked contests, compete on a less slanted field.  Scales, 518 N.W.2d at 591.

The lack of recording creates an informational dead spot that weakens the reliability of fact-finding.  It makes it harder for courts to decide voluntariness and waiver issues.  And it needlessly complicates jury decisions regarding proof of an element.  Kekona's dissent reasoned that lack of a verbatim record "substantially diminishes the reliability" of judicial review relating to voluntariness and waiver.  Kekona, 77 Hawai'i at 410, 886 P.2d at 747 (Levinson, J., concurring and dissenting).  The simple act of pressing "record" would accurately reflect the content and context of the interrogation, thereby enhancing public confidence in the justice system.  See id.

Without an objective record, fact-finders often have to resolve case-changing disputes based on incomplete, hazy, or self-serving recollections.  In a legal system intrinsically oriented toward truth, fairness, and accuracy (see, e.g., Hawai'i Rules of Evidence, HRS chapter 626), unrecorded interrogations undercut the reliability of fact-finding and create intolerable risks of wrongful conviction.

Thus, requiring recordings of custodial interrogations advances the integrity of the criminal justice system.

Last, recorded interrogations promote transparency and accountability in law enforcement practices. See Santiago, 53 Haw. at 264, 492 P.2d at 663 ("The objective of deterring improper police conduct is only part of the larger objective of safeguarding the integrity of our adversary system.") (quoting Harris v. New York, 401 U.S. 222, 231 (1971) (Brennan, J., dissenting).

Recordings provide a reliable record to evaluate the acts and words of police officers and suspects. And because recording provides a fair account of that interaction, it protects law enforcement from false accusations of coercion, misconduct, and unprofessional behavior.

The dangers of self-serving and inaccurate officer testimony recede with video and audio evidence. Preserving an interrogation may reveal coercive or manipulative tactics. Without an objective record, it is more difficult to challenge involuntary confessions. Recordings thus serve both as a deterrent to unlawful practices and a way to challenge them.

**D.  Constitutional due process requires police to record all custodial interrogations, regardless of location**

   **1.  In the decades since Kekona, in-station and "field" recording has become routine**

Decades ago, recording equipment was "readily available." Kekona, 77 Hawai'i at 405, 886 P.2d at 742. Today recording is routine. Now, well into the twenty-first century, we believe it

is always feasible to record in-station custodial interrogations. No longer just a best practice, recording custodial interrogations is a constitutional imperative.

Modern police departments commonly use recording technology for investigative and administrative purposes. Just like other evidentiary items police gather, it's not hard to safekeep and reproduce recorded evidence. No technical or operational barriers to recording interrogations were suggested to us. Advances in digital storage have met concerns about the costs and methods of storing recordings.

Broad jurisdictional support reflects awareness that recording is achievable and vital to the integrity of the criminal justice system. Federal law enforcement agencies, thirty states, and the District of Columbia require recordings as standard police protocol. See Brandon Garrett, Jurisdictions that Record Police Interrogations, Wilson Center for Science and Justice at Duke Law 2 (Aug. 2024) https://wcsj.law.duke.edu/wp-content/uploads/2024/08/Jurisdictions-that-Record-Police-Interrogations.pdf [https://perma.cc/Z5YQ-VNA6].

Recording custodial interrogations advances the Hawai'i Constitution's right against self-incrimination, right to confrontation, and right to a fair trial.

We hold that article I, section 5's constitutional range covers a procedural rule that requires law enforcement to record

constitutional rights warnings, waivers, and the entire custodial interrogation.

2. **We expand Hawai'i's due process protections to keep pace with technological advancements**

Due process is agile. Norms, values, and experiences change over time. A constitution adapts. See Emps.' Ret. Sys. of Hawaii v. Ho, 44 Haw. 154, 170-71, 352 P.2d 861, 870 (1960) (discussing United States v. Classic, 313 U.S. 299, 316 (1941)). See also Matter of Haw. Elec. Light Co., Inc., 152 Hawai'i 352, 359, 526 P.3d 329, 336 (2023) (right to a stable climate system conferred by broad purpose of constitutional provision, adapted to contemporary times).

Due process matures with technological advancements to protect constitutional rights. See In re JH, 152 Hawai'i 373, 381, 526 P.3d 350, 358 (2023) ("Context shapes the process that is due."); Stephan, 711 P.2d at 1161 ("The concept of due process is not static; among other things, it must change to keep pace with new technological developments.").

In Hawai'i, "due process is flexible and calls for such procedural protections as the particular situation demands." State v. Bani, 97 Hawai'i 285, 296, 36 P.3d 1255, 1266 (2001) (cleaned up). "[W]e have not hesitated to exclude statements or evidence from being used at trial when necessary to preserve the

28

integrity of the judicial process."  Baker, 147 Hawai‘i at 427, 465 P.3d at 874.

Today, law enforcement agencies routinely use recording equipment for many situations.  For instance, documenting crime scenes, filming sobriety tests, and monitoring detainees.  And nowadays most police-public encounters are preserved through body-worn camera footage.

Modern technology has made video and audio recording feasible in virtually all settings.  Officers wear high-quality cameras.  The widespread use of recording devices checks any claim that recording is unworkable outside police stations. Barriers that may have existed years ago are no longer present.

Any administrative or operational burden is slight compared to the constitutional stakes that arise from a custodial interrogation.  If children can record everyday events with ease, law enforcement cannot claim hardship to record perhaps its most consequential investigative act – an interrogation, one that often affects a person's liberty.

Because every county police department in Hawai‘i uses body-worn cameras, recording field interrogations is doable.  See, e.g., Hawai‘i Police Dep't, General Order 818, Body-Worn Cameras (Mar. 29, 2022), https://www.hawaiipolice.gov/wp-content/uploads/GO-818-PV-Body-Worn-Cameras.pdf [https://perma.cc/F3MG-6AEL]; see also Allan Parachini, Kauai:

Body Cameras are Police Officers' New Best Friends, Honolulu Civil Beat (Aug. 15, 2018), https://www.civilbeat.org/2018/08/kauai-body-cameras-are-police-officers-new-best-friends/#:~:text=Garden%20Isle%20cops%20have%20been,it's%20part%20of%20our%20uniform.%E2%80%9D ("It's part of our uniform.") [https://perma.cc/7AC9-DNG7]; Body Worn Cameras, Honolulu Police Dep't, https://www.honolulupd.org/policy/policy-body-worn-cameras/ [https://perma.cc/9APR-9K88]; Lila Fujimoto, "MPD to implement body camera program," The Maui News (July 22, 2017), https://www.mauinews.com/news/local-news/2017/07/mpd-to-implement-body-camera-program/ [https://perma.cc/5PDH-ZYGH].

Our state's police departments generally instruct officers to record their activities in the field. As the Hawaiʻi Police Department explained:

> The Hawaiʻi Police Department uses [body-worn cameras] as a means by which real time evidence and activity can be captured in an environment that cannot be duplicated again. It is vital to the law enforcement objective that real time video evidence be captured and utilized in police activities and [body-worn cameras] are an acceptable means to attain this goal.

Hawaiʻi Police Dep't General Order 818 (Mar. 29, 2022) at § 1.

Hawaiʻi County police officers are required to activate body-worn cameras "to record all enforcement related events." Id. at § 6.3.1. "Enforcement related events" are "calls for service," "law enforcement actions," "public interactions,"

"subject/traffic stops," "all use of force incidents," "any self-initiated police services," "Motor Vehicle Pursuits," and "transporting [people] to and entering a department detention or temporary detention facility." Id. at § 6.3.2. According to the Honolulu Police Department's website, "Officers shall immediately activate the [body-worn cameras] in event mode: (a) [b]efore arriving at a scene to which they are responding or were dispatched; (b) [w]hen initiating a law enforcement or investigative encounter; (c) [w]hen activating their blue lights and/or siren; or (d) [w]hen providing cover and/or possible assistance for types of situations described in a and b above." Body Worn Cameras, Honolulu Police Dep't, https://www.honolulupd.org/policy/policy-body-worn-cameras/ [https://perma.cc/9APR-9K88].

In our case, when officers stopped Zuffante and his girlfriend, they recorded the "law enforcement action" with their body cameras per department policy. See Hawaiʻi Police Dep't General Order 818 (Mar. 29, 2022) at § 1; § 6.2.2. The dissent pushes for committees and "stakeholder input." But it is unclear what more is needed. County police departments already adopted policies requiring recordings to preserve evidence and advance the constitutional rights contemplated in this opinion.

31

The due process rights stakes are high. Custodial interrogations are inherently coercive. State v. Amorin, 61 Haw. 356, 362, 604 P.2d 45, 49 (1979) (custodial interrogations contain "inherently compelling pressures which work to undermine the individual's will to resist and to compel [them] to speak where [they] would not otherwise do so freely.").

The natural pressures and the need for objective evidence are present *wherever* a suspect ends up in custody and faces interrogation. It doesn't matter whether an interrogation occurs in a police station, home, park, patrol car, or on a sidewalk. The risks of unreliable confessions, problems with "swearing contests," and the difficulties courts and juries have in reconstructing what really happened, are not limited to the station house. So we see no reason to exempt custodial interrogations outside a station from article I, section 5's new constitutional rule.

Limiting the recording requirement to police stations may also create a perverse incentive for law enforcement to conduct interrogations elsewhere. Kekona worried that if in-station custodial interrogations required recording, then officers would choose to conduct interrogations elsewhere. 77 Hawai'i at 409, 886 P.2d at 746. We believe Hawai'i's modern police departments would not engage in such subterfuge, but recording eliminates any temptation.

32

We hold that article I, section 5 of the Hawai'i Constitution requires not only that all custodial interrogations in police stations be recorded, but that *all* custodial interrogations no matter the place, be recorded.

This rule is a reasonable and necessary safeguard, essential to the protection of the accused's right to confrontation, right against self-incrimination, and right to a fair trial. See Stephan, 711 P.2d at 1159-60; Scales, 518 N.W.2d at 592.

We hold that unless the State establishes by a preponderance of the evidence that recording a custodial interrogation outside the station is infeasible under the circumstances, the failure to record results in the exclusion of the unrecorded statement. Stephan, 711 P.2d at 1162-64.

Feasibility quells worries that evidence of otherwise constitutional interactions will be inadmissible at trial. If outside-the-station recording is not feasible, the statements obtained are admissible.

Exclusion is justified by the need to deter noncompliance, protect constitutional rights, and preserve the integrity of the justice system. State v. Torres, 125 Hawai'i 382, 394, 262 P.3d 1006, 1018 (2011); State v. Manion, 151 Hawai'i 267, 272, 511 P.3d 766, 771 (2022). An exclusionary rule provides clear guidance to law enforcement and the courts, ensures uniform

application, and reduces litigation over the admissibility of statements.

We limit the remedy for unrecorded custodial interrogations to the unrecorded statement itself – not to derivative evidence. The failure to record is a violation of a procedural safeguard, not a direct constitutional violation like a coerced confession. Inadmissibility does not extend to "fruit of the poisonous tree" evidence unless the underlying statement was itself obtained in violation of a constitutional right. The fruits doctrine does *not* automatically require suppression of derivative evidence uncovered from an unrecorded statement.

3. **Kekona's reasoning lacks practical relevance in light of recent scientific research on false confessions and modern access to recording technology**

What about Kekona?

Thirty years ago, this court endorsed preserving a complete account of a station house interrogation through technology. Kekona, 77 Hawai'i at 409, 886 P.2d at 746 ("Undeniably, recording a custodial interrogation is important in many contexts.").

Yet the Kekona majority held that recording an interrogation only had an aspirational quality. Id. No law or constitutional provision required recording. Id. ("[A]lthough we decline to interpret the due process clause of the Hawai'i Constitution as requiring that all custodial interrogations be

34

recorded, we nevertheless stress the importance of utilizing tape recordings during custodial interrogations when feasible."). Failure to record custodial interrogations, the majority ruled, did not make a criminal trial unfair. Id.

In our case, the dissent believes that State v. Eli's reliance on Kekona precludes overturning Kekona. Absent clear rejection of the bases for our holding today, we do not see how Eli prevents this court from overturning Kekona.

Eli seemed to think that Kekona had a different holding. He argued "that Detective was required by (a) [Kekona] . . . and (b) HPD policy, to record the encounter with Defendant." State v. Eli, 126 Hawai'i 510, 519, 273 P.3d 1196, 1205 (2012).

Eli wanted to suppress his unrecorded statements before the waiver of his Miranda rights. Id. at 518-19, 273 P.3d at 1204-05. He alleged (and the detective agreed) that he had agreed to give a statement before any Miranda warning was administered. Id. at 514-16, 273 P.3d at 1200-02. (The detective then recorded the reading of the Miranda warnings and his post-Miranda statement.) Id. at 515, 273 P.3d at 1201.

The court relied on Kekona to reject Eli's arguments that the recorded statements obtained after his unrecorded pre-Miranda statements should be suppressed. Id. at 519, 273 P.3d at 1205. He did not argue that the court should adopt the Stephan rule or overturn Kekona. He argued that violation of

HPD policy rendered the statement inadmissible, and that "as a matter of public policy, [the court should] exclude statements obtained after an unrecorded waiver."  Id.

Eli relied on Kekona, but at no point revisited its reasoning.  It repeated Kekona's holding that defendants "have the opportunity to cross-examine the police officers who conducted their interrogations, and to set forth their own account of events through testimony."  Eli, 126 Hawai'i at 519, 273 P.3d at 1205.  But Eli did not examine the impact of this purported "safeguard" on the right against self-incrimination. Nor did it weigh the technological feasibility of recording with the constitutional and practical impacts on defendants.  Thus, Eli does not preclude this court from interpreting the Hawai'i Constitution as times and technologies change, and new constitutional concerns emerge.

DNA evidence has proved many things.  For one, it has revealed how false confessions have led to wrongful convictions. See Richard A. Leo et al., Promoting Accuracy in the Use of Confession Evidence: An Argument for Pretrial Reliability Assessments to Prevent Wrongful Convictions, 85 Temple L. Rev. 759, 777 (2013); James R. Acker, The Flipside Injustice of Wrongful Convictions: When the Guilty Go Free, 76 Alb. L. Rev. 1629, 1629, 1660 (2013).  About one-third of the 375 DNA exonerations between 1989 and 2020 involved false confessions.

DNA Exonerations in the United States (1989 – 2020), Innocence Project, https://innocenceproject.org/dna-exonerations-in-the-united-states/ [https://perma.cc/6AD5-MAJ7]. (It is unclear how many of these false confessions involved recorded interrogations.) See Richard A. Leo, False Confessions: Causes, Consequences, and Implications, 37 J. Am. Acad. Psychiatry & L. 332, 337 (2009) ("most documented false-confession cases are not [recorded]").

Recording the exact circumstances of interrogations is thus a worthwhile procedural reform to avoid false confessions and wrongful convictions. See State v. Harrison, 95 Hawai'i 28, 32, 18 P.3d 890, 894 (2001) ("Among courts' inherent powers are the powers to create a remedy for a wrong even in the absence of specific statutory remedies, and to prevent unfair results.") (citations omitted).

Hawai'i's due process clause adapts to confront threats to the fairness of criminal proceedings. Due process principles, as applied to today's people, require recorded custodial interrogations.

Stare decisis, while foundational to stability in the law, is no everlasting command. It must yield if following precedent perpetuates injustice or fails to protect constitutional rights given evolving legal and factual understandings. See State v. Kekuewa, 114 Hawai'i 411, 419, 163 P.3d 1148, 1156 (2007) ("While

37

'there is no necessity or sound legal reason to perpetuate an error under the doctrine of stare decisis' . . . a court should 'not depart from the doctrine of stare decisis without *some compelling justification.*'").

Given social science research on false confessions, the easy access to recording technology, the truth-detecting features of recording, decades-long legislative inaction (in many states, courts had no need to articulate a right because their state legislatures beat them to it), and the Hawai'i Constitution's dynamic tradition of rights protection, we overrule State v. Kekona.

Article I, section 5 of the Hawai'i Constitution requires that all in-station custodial interrogations be recorded, and that all outside-the-station custodial interrogations be recorded when feasible.

### 4. "Pipeline" Retroactive Effect

"The question of prospective application arises when this court announces a new rule." State v. Jess, 117 Hawai'i 381, 400, 184 P.3d 133, 152 (2008). Generally, "judicial decisions are assumed to apply retroactively[.]" Ketchum, 97 Hawai'i at 123 n.26, 34 P.3d at 1022 n.26 (citation omitted). "If[] . . . a judicial decision announces a 'new rule,' then this court may, in its discretion, determine that the interests of fairness preclude retroactive application of the new rule." Id.

38

This court has identified "what degree a new rule is to have retroactive effect." Lewi v. State, 145 Hawai'i 333, 349 n.21, 452 P.3d 330, 346 n.21 (2019). We may give a new rule: (1) purely prospective effect ("applied neither to the parties in the law-making decision nor to those others against or by whom it might be applied to conduct or events occurring before that decision"); (2) limited or "pipeline" retroactive effect ("the rule applies to the parties in the decision and all cases that are on direct review or not yet final as of the date of the decision"); and (3) full retroactive effect ("the rule applies both to the parties before the court and to all others by and against whom claims may be pressed"). Id.

This court has also recognized a fourth option, "selective retroactive effect," where the court applies the new rule "in the case in which it is pronounced, then returns to the old rule with respect to all other cases arising on facts predating the pronouncement." Id. (cleaned up). But we have declined to apply selective retroactive effect in criminal cases because "selective application of new rules violates the principles of treating similarly situated defendants the same." League of Women Voters of Honolulu v. State, 150 Hawai'i 182, 207 n.39, 499 P.3d 382, 407 n.39 (2021) (citations omitted).

"[W]e 'weigh the merits and demerits' of retroactive application of the particular rule in light of '(a) the purpose

39

of the newly announced rule, (b) the extent of reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards.'" Lewi, 145 Hawai'i at 349 n.21, 452 P.3d at 346 n.21.

Based on these factors, we believe a purely prospective or a full retroactive application of the new recording rule would be inappropriate.  We choose the "middle ground," and hold that this case's new rule applies with "pipeline" retroactive effect. See id.  The rule is thus prospective in effect, but applies retroactively only to cases that are on direct review or not yet final as of the date of this case's decision.

Regarding the first factor, we believe a purely prospective rule undermines defendants' constitutional rights: the right to a fair trial, the right to confrontation, and the right against self-incrimination.  The purpose of the newly announced rule is to protect an accused's constitutional rights – protections we believe are important enough to warrant limited retroactive application.  Also, retroactive application of a new rule "is generally provided to rules designed to protect the very integrity of the fact-finding process."  Jess, 117 Hawai'i at 402, 184 P.3d at 154 (cleaned up); Lewi, 145 Hawai'i at 349 n.21, 452 P.3d at 346 n.21.  Because the recording requirement is designed to improve the reliability of judicial and juror fact-

finding, we believe this rule protects the integrity of our criminal justice system's truth-detecting function, and should be applied retroactively.

The second factor, though, counsels against *full* retroactive application of this rule. We understand that, like here, most police-suspect interactions inside and outside the station are recorded. But Hawai'i has had no recording requirement. Given the extent of law enforcements' reliance on Kekona, the interests of fairness call for the rule to have a generally prospective application. See Lewi, 145 Hawai'i at 349 n.21, 452 P.3d at 346 n.21.

Last, the effect of the new standard on the administration of justice counsels against *full* retroactive application, yet does not require *purely* prospective application. Our courts are capable of addressing cases already on direct review (or not yet final) challenging unrecorded custodial interrogations. Cf. id. (declining to apply full retroactive application because the court anticipated "a flood of [Hawai'i Rules of Penal Procedure] Rule 40 petitions challenging [the Hawai'i Paroling Authority's] minimum term determinations.").

Thus, our new rule is prospective in effect, but is applied to Zuffante and all cases that are on direct review or not yet final on the date of this decision.

### III.

We vacate the ICA's judgment and the Circuit Court of the Third Circuit's April 6, 2023 First Amended Judgment of Conviction and Sentence.  We remand to the Circuit Court of the Third Circuit for proceedings consistent with this opinion.

| | |
|---|---|
| Georgette A. Yaindl<br>for petitioner | /s/ Sabrina S. McKenna |
| | /s/ Todd W. Eddins |
| Frederick M. Macapinlac<br>for respondent | /s/ Vladimir P. Devens |



Jongwook Kim, Emily Hills, and
Matthew Segal (on the briefs)
for amici curiae
ACLU of Hawai'i Foundation and
American Civil Liberties Union
Foundation

L. Richard Fried, Jr., Jennifer
Brown, William Harrison, Lauren
Gottesman, J. Ian Downes, and
Matthew L. Mazur (on the briefs)
for amici curiae
Hawai'i Innocence Project and
The Innocence Project